# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-00869-SCT

*TITAN INDEMNITY COMPANY, UNITED STATES FIDELITY AND GUARANTY COMPANY AND ST. PAUL FIRE AND MARINE INSURANCE COMPANY*

*v.*

*CARROLL V. HOOD, HICO, INC. AND OLD SOUTH INSURANCE GROUP, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/30/2001 |
| TRIAL JUDGE: | HON. MIKE SMITH |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JAMES FREDERICK AHREND |
| | JAMES W. CRAIG |
| | LUTHER T. MUNFORD |
| | W. WAYNE DRINKWATER, JR. |
| | MARGARET OERTLING CUPPLES |
| | VIVIAN CONWAY HENLEY |
| | CHARLES G. COPELAND |
| | REBECCA JORDAN BLUNDEN |
| | CHRISTOPHER ROYCE SHAW |
| | EVAN M. TAGER |
| | CHRISTOPHER C. WANG |
| ATTORNEYS FOR APPELLEES: | JAMES D. SHANNON |
| | ELISE BERRY MUNN |
| | KELLEY MITCHELL BERRY |
| | RENEE C. HARRISON |
| | BRANDON LEE OGBURN |
| | WILLIAM A. ALLAIN |
| | C. LEE LOTT, III |
| | EUGENE M. HARLOW |
| | CHRISTOPHER BRIAN MCDANIEL |
| | WALKER (BILL) JONES |
| | ROBERT M. ARENTSON |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND RENDERED - 11/22/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.    The jury award in this breach of contract case from Copiah County exceeded $82 Million,[1] $80 Million of which was punitive damages.    The contract in question contains a provision which vests the courts of Bexar County, Texas, with exclusive personal jurisdiction and venue of the issues litigated by the parties.  Accordingly, we reverse and render.

## FACTUAL BACKGROUND

¶2.    The Mississippi Legislature partially abolished sovereign immunity in 1993. The resulting potential liability[2] for Mississippi's political subdivisions,[3] opened a substantial market for "public entity" liability insurance.

¶3.    Jerald Delaney from the Hazlehurst area had sold public entity insurance for Titan[4] and its predecessor, Innsbrook, beginning in the 1980's.  Carroll Hood, Delaney's friend for many years, was a successful businessman with extensive political connections throughout

---

[1]The jury actually returned a verdict of punitive damages in favor of HICO in the amount of "$75,000,000,000" (seventy-five billion dollars).  The circuit judge determined that the jury meant to write "$75,000,000.00" (seventy-five million dollars).  Additional punitive damages of $5 Million were awarded to Old South.

[2]Miss. Code Ann §§ 11-46-15.  The limit of liability allowed under the statute was Fifty Thousand Dollars on July 1, 1993.  On July 1, 2001, the limit increased to its current level of Five Hundred Thousand Dollars.

[3]Political subdivisions such as cities, counties, schools, fire departments, etc., are also known as "public entities."

[4]The defendant in this case is Titan Indemnity Company.  The contract between Titan and HICO, discussed infra, is with Titan Holdings, Inc.  Other than a passing reference at oral argument, and a footnote in one of the papers filed with the trial court, the parties make no distinction, and so neither shall we.  We do note, however, that Titan Indemnity Company is licensed with the Mississippi Department of Insurance, whereas Titan Holdings, Inc. is not.

Mississippi. Hood has engaged in various businesses for almost 40 years, including a wholesale distributorship for Philips Petroleum, commercial and residential real estate, and horse breeding. Hood has also served as chairman of the boards of a local hospital and bank, chairman of the Mississippi Oil and Gas Board, and a member of the Mississippi Parole Board and the Mississippi Employment Security Commission.

¶4. Believing Hood's political connections could serve to "open the doors" to many public entities and help acquire their insurance business, Delaney introduced Hood to Titan. This led to a preliminary, non-exclusive agreement[5] for Hood's company, HICO, Inc., to market Titan's public entity insurance products in part of Mississippi. Delaney joined up with HICO, becoming one of its corporate officers, and its primary salesman.

¶5. During HICO's initial contract period with Titan, Hood and Delaney convinced the Mississippi Association of Supervisors to endorse the Titan insurance product marketed by HICO. In exchange for their endorsement, the Association of Supervisors would receive a two percent "royalty." The significance of this endorsement was explained by Hood's testimony:

> Q. What is the value of the endorsement of the Mississippi Association of Supervisors?
>
> A. It's quite valuable.
>
> Q. How is it valuable?
>
> A. It's valuable because they have the open doors. . . .
>
> Q. And did you work out a deal with the Association of Supervisors where they gave you that endorsement?

---

[5]This preliminary agreement provided certain requirements and sales quotas which, if met, entitled HICO to an exclusive contract with additional advantages.

3

A.     That's correct.

Q.     And what deal did you work out with the Association of Supervisors in getting an endorsement?

A.     We paid them 2 percent of total county premium, and we also taken three of their people – really, two of their people – to help us market where we could convert these 28 counties over to Titan.

¶6.     After it obtained this coveted endorsement, and having achieved the required production quotas set out in the preliminary agreement, HICO was offered a new contract, which provided that HICO would have exclusive authority to market Titan's public entity insurance in Mississippi. This agreement was memorialized by a "Representative Agreement," which was made and entered as of January 1, 1994. It is this Representative Agreement that is at the center of the controversy.

¶7.     Pursuant to the Representative Agreement, "Hood and HICO became the sole and exclusive marketing arm for Titan in Mississippi, and as a result, the only company for which Hood and HICO could market insurance was Titan."[6] Under this new Representative Agreement, HICO marketed Titan's insurance by contacting independent insurance agents in various counties, and selling the insurance through them. In order to sell Titan's insurance, the independent agent signed a "Producer's Contract," which set forth the terms and conditions of the agreement between Titan and the independent agent. When a policy was sold under this arrangement, both the agent and HICO were entitled to receive a commission.

¶8.     In September, 1994, Old South Insurance Group, Inc., was formed by Delaney and two partners, for the purpose of combining three insurance agencies under one umbrella, and

---

[6]This characterization is provided by appellee Old South Insurance Group, Inc., discussed infra.

4

marketing various insurance products in a three-town area. On February 1, 1995, Old South and Titan executed a Producer's Contract. Paragraph 3., of that contract addressed "Ownership of Expirations." It specifically provided, *inter alia*:

A. In the event of termination of this Agreement, provided the Producer has promptly accounted for and paid over premiums for which the Producer may be liable to Titan, the Producer's records, use and control of expirations shall remain the property of the Producer and be left in his undisputed possession, otherwise the records, use, and control of expiration shall be vested in Titan.

¶9. The parties do not seem to agree on the meaning of this provision. Old South says it generally means that, should Old South place a Titan policy with a public entity, Old South would be entitled to renew the policy, even if the Producer's Contract was terminated. Hood appears to believes it entitles the producer to future commissions on the account, but not to sell the renewals.

¶10. For several years, HICO marketed Titan's insurance under this arrangement through independent agents, including Old South. Then, in 1997, Titan was purchased by the United States Fidelity and Guaranty Company ("USF&G") which, soon thereafter, was purchased by St. Paul Fire and Marine Company ("St. Paul").[7]

¶11. In 1998, without Hood's knowledge, Delaney (acting on behalf of Old South) entered negotiations with Titan's competitor, Zurich Insurance Company, to market the Zurich public entity insurance policy. On June 29, 1998, while Hood was out of town, Delaney left a note resigning from HICO. Old South had signed an agreement with Zurich, effective August 14,

---

[7]The parties sharply dispute St. Paul's role during the period 1998, through 2000. In attempting to establish St. Paul's liability, appellees make no distinction between St. Paul and Titan. Our disposition of the case renders the distinction irrelevant.

1998. When St. Paul learned that Delaney had resigned from HICO, it notified the Mississippi Insurance Commission on July 14, 1998, that Old South's authority to serve as a St. Paul agent was terminated. St. Paul did not, however, notify Old South of the termination until November 18, 1998. Miss. Code Ann. §83-17-5 provides in pertinent part: "The insurance company . . . must notify the agent within thirty (30) days if the authority is non-renewed or cancelled."

¶12. After acquiring its new contract, Old South began to develop public entity insurance business for Zurich, including three new accounts procured in October, 1998. Nevertheless, Old South claims it lost business during the second half of 1998, because St. Paul's exclusive marketing agent, HICO, visited the various accounts and represented that Old South no longer had authority to sell the insurance for St. Paul. Specifically, Old South states:

> [E]ven though Old South had the contractually mandated "expirations" (also known as "rights of renewal") on eight (8) public entity accounts . . . St. Paul's exclusive marketing representative [HICO] began approaching Old South accounts, in direct contravention of the producer's contract and asking that the accounts be moved from Old South.

¶13. Thus, in late 1998, Delaney and Old South wanted to sell public entity insurance for Zurich, and they wanted St. Paul to recognize their right to approach St. Paul (Titan) policyholders and either renew Titan policies or move the customers to Zurich. HICO and Hood, on the other hand, took the position that, since Delaney had resigned, and since HICO had an exclusive marketing agreement with Titan, then neither Old South nor Delaney could continue to call on HICO customers who were up for renewals of their Titan policies. A volume of correspondence aimed at reaching a solution was exchanged among Old South, HICO and St. Paul. These efforts were not successful and the hot water began to boil.

6

¶14.     On October 4, 1999, the first of several permutations of this lawsuit was filed.  HICO and Hood filed suit against Titan, USF&G, St. Paul, Delaney, Old South and BancorpSouth Bank.[8]

   *Suit against St. Paul*

¶15.     HICO's complaint charged St. Paul with breaching its contract by not paying certain commissions; by raising premiums so high that it cost HICO business; by trying to give the George County account to Delaney and Old South;[9] and by taking other unspecified steps to damage HICO.   These actions, according to plaintiffs, resulted in causes of action for breach of contract, tortious breach of contract, breach of the duty of good faith and fair dealing, tortious interference with business relations, negligence, and gross negligence.

   *Suit against Delaney and Old South*

¶16.     Hood and HICO claimed that Delaney left his employ with HICO and began to solicit business for Zurich in an unethical manner.   The complaint further charged that, even though Delaney was fully aware of the exclusive nature of the HICO/Titan contract, he nevertheless "convinced St. Paul to allow Delaney/Old South to act as the agent of record for St. Paul when bidding to write public entity insurance for George County, Mississippi."

¶17.     Additionally, the complaint alleged that Delaney and Old South had a fiduciary duty to act on behalf of HICO, "as St. Paul's exclusive marketing force in the State of Mississippi,"

---

[8] At trial, BancorpSouth received a jury verdict in its favor, which was not appealed and is now *res judicata.*

[9] We note parenthetically that Old South was later to claim that St. Paul was trying to take away its customer, George County, and give it to HICO.  St. Paul, being attacked from both sides, never provides a clear answer of what it was trying to do.

and that "Delaney, while acting as an employee of Old South, intentionally and purposefully violated said duties. . . ."

¶18. Finally, the complaint accused St. Paul, Delaney, Old South and others of engaging in a conspiracy to injure HICO and Hood.

¶19. Delaney and Old South answered the suit, denying any liability to the plaintiffs. Titan, USF&G and St. Paul filed a motion to dismiss for lack of jurisdiction and improper venue, claiming that the Representative Agreement required the suit to be brought in Bexar County, Texas. The trial court denied the motion on March 24, 2000.

¶20. On August 11, 2000, Delaney and Old South filed a cross claim against St. Paul for the alleged wrongful actions of "Carroll Hood, as an acting agent for [St. Paul]." Immediately thereafter, Hood and HICO amended their complaint to add a claim against Titan/St. Paul for wrongful termination.

¶21. Prior to trial, the rhetoric between Hood/HICO and Delaney/Old South began to soften, and they began to look toward St. Paul. Realizing it would be the prime target at trial, St. Paul began to circle the wagons. St. Paul filed a counterclaim against Hood and HICO, asserting a right under the Representative Agreement to be indemnified for any loss as a result of the cross claim filed by Delaney and Old South.

¶22. Trial began on November 28, 2000, but problems with the jury caused a delay until February 12, 2001. Two days into the trial, the trial court entered a forty-six page pretrial order. Eleven days into the trial, Delaney and Old South moved to amend their cross claim

8

against St. Paul, to include violation of Miss. Code Ann. §83-17-5.[10]   St. Paul vigorously opposed the motion, claiming they were not prepared to defend a new claim of violation of the statute.   Nevertheless, the motion was granted, and the trial court instructed the jury that violation of the statute could be used to impose liability against St. Paul, in favor of Old South.

¶23.   In their testimony at trial, Hood and Delaney had little negative testimony to offer against the other.   Indeed, before the conclusion of the trial, Hood/HICO and Delaney/Old South settled all claims between them.   St. Paul requested the trial court to require disclosure of the terms of the settlement to the jury.  The trial court refused.

¶24.   The jury returned a verdict against St. Paul in favor of HICO in the amounts of $1.3 million in compensatory damages and $75 million in punitive damages; against St. Paul in favor of Hood based on an emotional distress claim in the amount of $1.2 million in compensatory damages; against St. Paul in favor of Old South on the cross-claim in the amounts of $310,000 in compensatory damages and $5 million in punitive damages.   BancorpSouth received a defense verdict.

¶25.   Titan, USF&G and St. Paul timely perfected an appeal to this Court.   Six of the justices[11] currently serving on this Court declined to participate in deciding this case, leaving three justices[12] to review the appeal.   Because our Constitution requires five justices for a quorum,

---

[10]The proposed amendment charged that Titan/St. Paul violated Miss. Code Ann. §83-17-5 by failure to meet the statutory deadline for notice to Old South that its authority to serve as a St. Paul agent had been terminated.  Old South was not notified of the termination until November 18, 1998, which was three months past the date notification should have been given.

[11]Chief Justice Smith, Presiding Justice Waller, and Justices Diaz, Carlson, Graves and Randolph.

[12]Presiding Justice Cobb, and Justices Easley and Dickinson.

9

an appointment of two special justices by the Governor was necessary to decide the case. Miss. Const. Art. 6, §145B. This Court entered an Order dated May 25, 2004, requesting the appointments, and by letter dated and filed of record August 18, 2004, Governor Barbour appointed Judge Henry L. Lackey, Circuit Judge, Third Circuit Judicial District, and Judge R. I. Prichard, Circuit Judge, Fifteenth Circuit Judicial District, to serve as special justices to decide this case.

## DISCUSSION

**WHETHER THE TRIAL COURT ERRED BY DENYING, THEN REFUSING TO RECONSIDER, ST. PAUL'S MOTION TO DISMISS BASED UPON THE FORUM SELECTION CLAUSE IN THE REPRESENTATIVE AGREEMENT.**

### A. STANDARD OF REVIEW

¶26. St. Paul argues that the circuit court's ruling on the enforceability of the clause is subject to a de novo review since this Court has held that the interpretation of such clauses is a matter of law. *Tel-Com Management, Inc. v. Waveland Resorts Inns, Inc.*, 782 So. 2d 149, 151 (Miss. 2001). On the other hand, Hood asserts that the issue of the enforceability of the clause is a question of fact subject to the abuse of discretion standard. We did not specifically state in *Tel-Com* what standard of review we should use in reviewing matters concerning the interpretation and enforcement of a forum selection clause.

¶27. There is a split among jurisdictions as to the standard of review. Many federal circuits and several states utilize the de novo standard of review. *See Lambert v. Kysar*, 983 F.2d 1110, 1112 (1st Cir.1993); *Instrumentation Assocs., Inc. v. Madsen Electronics (Canada) Ltd.*, 859 F.2d 4, 5 (3d Cir.1988); *Mitsui & Co. (USA), Inc. v. Mira M/V*, 111 F.3d 33, 35 (5th Cir.

10

1997); ***Hugel v. Corp. of Lloyd's***, 999 F.2d 206, 207 (7th Cir.1993); ***Riley v. Kingsley Underwriting Agencies, Ltd.***, 969 F.2d 953, 956 (10th Cir.), cert. denied, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992); ***Lipcon v. Underwriters at Lloyd's, London***, 148 F.3d 1285, 1290-91 (11th Cir.1998), cert. denied, 525 U.S. 1093, 119 S.Ct. 851, 142 L.Ed.2d 704 (1999); ***Bennett v. Appaloosa Horse Club***, 35 P.3d 426, 429 (Ariz. Ct. App. 2001); ***Yamaha Corp. v. Yasuda***, 712 NE 2d 926 (Ill. App. 1999); ***Paradise Enterprises Ltd. v. Sapir***, 811 A.2d 516 (N.J. Sup. App. Div. 2002).

¶28.    Other jurisdictions utilize the abuse of discretion standard. *See **Sun World Lines, Ltd. v. March Shippin Corp.***, 801 F. 2d 1066 (8th Cir. 1986); ***Kukje Hwajae Ins. Co., Ltd. v. M/V Hyundai Liberty***, 294 F.3d 1171 (9th Cir. 2002); ***O'Brien Eng'g Co. v. Continental Mach.***, 738 So.2d 844 (Ala. 1999); ***Hauenstein & Bermeister, Inc. v. Met-Fab Industries***, 320 N.W.2d 886, 889-90 (Minn.1982); ***Cox v. Dine-a-Mate, Inc.***, 501 S.E.2d 353 (N.C. Ct. App. 1998); ***Eads v. Woodmen of the World Life Ins. Soc.***, 785 P.2d 328, 331 (Okla.App.1989); ***Prows v. Pinpoint Retail Systems, Inc.***, 868 P.2d 809, 810 (Utah 1993).

¶29.    California circuits are split as to whether the courts should utilize the abuse of discretion or the substantial evidence standard. ***Cal-State Bus. Products & Services, Inc. v. Ricoh***, 16 Cal.Rptr.2d 417 (Cal. Dist. Ct. App. 1993) (applying abuse of discretion); ***Lu v. Dryclean-U.S.A. of California, Inc.***, 14 Cal.Rptr.2d 906 (Cal. Dist. Ct. App. 1992) *(applying* substantial evidence); ***Furda v. Superior Court***, 207 Cal.Rptr. 646, (Cal. Dist. Ct. App. 1984) (applying substantial evidence); ***Smith, Valentino & Smith, Inc. v. Superior Court***, 551 P.2d 1206 (Cal. 1976) (applying substantial evidence).    Wyoming courts hold that forum selection

clauses are prima facie valid and enforced unless enforcement is unreasonable, fraud is present, or there are unequal parties. *Durdahl v. Nat'l Safety Assoc., Inc.*, 988 P.2d 525 (Wyo. 1999).

¶30.    We find persuasive the reasoning set forth by the Fifth Circuit where that court compared the interpretation of a forum selection clause to the interpretation of an arbitration clause and, therefore held that a de novo review was appropriate. *Mitsui & Co. (USA), Inc. v. Mira M/V*, 111 F.3d 33, 35 (5th Cir. 1997).   In Mississippi, the grant or denial of a motion to compel arbitration is reviewed de novo. *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002).    For this reason, we find that issues pertaining to the interpretation and enforcement of a forum selection clause should be deemed to be questions of law and subject to de novo review.

### B.  WHETHER THE CLAUSE IS MANDATORY OR PERMISSIVE

¶31.    In determining whether a forum selection clause is enforceable, the Fifth Circuit examines the clause itself to determine whether the clause is mandatory or permissive.    If the clause is mandatory, the Court then decides if it is enforceable under the standards discussed below.    If it is permissive, i.e., if it does not prohibit litigation elsewhere,   then the clause is not enforced. *See Bentley v. Mutual Benefits Corp.*, 237 F. Supp. 2d 699, 701-02 (S.D. Miss. 2002); *see also Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127 (5th Cir. 1994).   Again, we find the Fifth Circuit Court's reasoning persuasive and follow that reasoning.

¶32.    The clause at issue provides that ". . . the parties consent to the *exclusive* personal jurisdiction and venue . . . ."   This language is neither ambiguous nor unclear.   We hold that the

clause is a mandatory contract term. We now turn to the question of whether the clause should have been enforced.

## C. WHETHER THE CLAUSE IS ENFORCEABLE

¶33. There is no dispute that the Representative Agreement included a forum selection clause which provides that exclusive personal jurisdiction and venue is in Bexar County, Texas. However, appellees challenge the enforceability of that provision.

¶34. The United States Supreme Court has addressed forum selection clauses, and held them presumptively valid and enforceable, unless the resisting party can show:

1. Its incorporation into the contract was the result of fraud, undue influence or overweening bargaining power;

2. The selected forum is so gravely difficult and inconvenient that the resisting party will for all practical purposes be deprived of its day in court; or

3. The enforcement of the clause would contravene a strong public policy of the forum in which the suit is brought, declared by statute or judicial decision.

*M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12-13, 92 S. Ct. 1907, 1914, 1916-1917, 32 L. Ed. 2d 513 (1972). Although *Zapata* is an admiralty case, its standard has been widely applied to forum selection clauses generally. *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 512 (9th Cir.1988).

¶35. In *Tel-Com* – this Court's only previous case addressing the enforceability of forum selection clauses – we cited *Zapata* with approval. The *Tel-Com* majority held that "two commercial sophisticated corporations can decide what forum is to resolve any and all disputes after an arms length contract is negotiated." *Tel-Com,* 782 So. 2d at 150. *See also*

13

*Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S. Ct. 1522, 1528, 113 L. Ed. 2d 622 (1991).

¶36.   In addressing whether a forum selection clause is enforceable, the resisting party bears the burden of showing that the enforcement of the clause is unreasonable. *Zapata*, 92 S.Ct. at 1917.

¶37.   HICO argues that the clause is unreasonable, and should not be enforced, because (1) interrelated litigation involves other parties not subject to the contract or the jurisdiction of Bexar County, Texas; (2) corporate mergers and/or acquisitions render Bexar County, Texas unreasonable as a forum, especially in light of Mississippi's interest in the proceedings and the fact that Texas has no identifiable interest in the litigation; (3) the clause does not enhance contract predictability but, rather, would operate to deprive Hood and HICO of their day in court; (4) the circuit court reasonably exercised its jurisdiction; and (5) Titan waived and abandoned its rights under the clause.

¶38.   We find the analysis set forth in *Zapata*, and approved in *Tel-Com*, to be appropriate, and we now proceed to apply the *Zapata* factors to the facts of this case.

1.    <u>Whether the incorporation of the forum selection clause into the contract was the result of fraud, undue influence or overweening bargaining power.</u>

¶39.   We first look to see whether the contract was entered as a result of fraud, undue influence, or overweening bargaining power.   Here, there are no allegations of fraud, undue influence, or overweening bargaining power with respect to the preparation and execution of the Representative Agreement.   To the contrary, Hood testified that all was well with Titan before St. Paul's involvement.

14

¶40. HICO and Hood include an argument that the clause was not negotiated, but rather was included as part of Titan's "boilerplate" contract language. Even if this claim is true, we hardly accept the notion that "boilerplate" contract language is unenforceable. "To permit a party when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts." *Busching v. Griffin*, 542 So. 2d 860, 865 (Miss. 1989).

¶41. With limited exceptions, persons enjoy the freedom to contract. When they do, they are bound by the terms of their contracts. HICO, by and through Hood, freely entered into the Representative Agreement, which consisted of six typed pages. Some provisions were heavily negotiated – some were not. Few are immune from the societal demands and modern commerce considerations which require compliance with the terms of pre-written contracts every day. Indeed, it is doubtful that any of the insurance products sold by Hood, HICO, Delaney or Old South, were free of "boilerplate" provisions which they claim are unenforceable. We can think of no rational argument that seasoned, sophisticated business persons (such as those involved here) should not be held to the terms of their contracts. This is so, even where they claim that they did not read the entire contract before signing it. Accordingly, this *Zapata* factor weighs heavily in favor of enforcing the forum selection clause.

       2. <u>Whether the selected forum is so gravely difficult and inconvenient that the resisting party will for all practical purposes be deprived of its day in court.</u>

¶42. Secondly, we inquire whether enforcement of the forum selection clause would be so gravely difficult and inconvenient that – for all practical purposes – HICO and Hood would be deprived of their day in court.

¶43. The burden of proving this element is much more difficult for sophisticated businesses than for individual consumers. The *Zapata* Court stated that a forum selection clause "should control absent a strong showing that it should be set aside." *Zapata*, 92 S.Ct. at 1916. Furthermore, mere reference to the expense the litigant may incur to litigate the matter in another forum does not meet the burden of proof. *Id.* at 1917.

¶44. Under this factor, Hood and HICO raise several arguments, all of which we shall address, albeit in a different order.

*Interrelated litigation – Old South*

¶45. HICO/Hood's concern with "interrelated litigation" which involves parties "not subject to the contract" relates primarily to Old South. Thus, we first address whether Old South is subject to the forum selection clause.

¶46. In *Lu*, a California appeals court was faced with similar facts. A non-signatory defendant was alleged to have participated in tortious conduct and was involved with the corporate business structure in the franchising dry-cleaning establishment. That court held:

> 'A range of transaction participants, parties, and non-parties, should benefit from and be subject to forum selection clauses.' [citations omitted]. (*Manetti-Farrow, Inc. v. Gucci America, Inc.* (9th Cir. 1988) 858 F.2d 509, 514, fn. 5). Here, the alleged conduct of Dryclean Franchise and Dryclean U.S.A. is closely related to the contractual relationship. They are alleged to have participated in the fraudulent representations which induce plaintiffs to enter into the Agreement. Indeed, plaintiffs go so far as to allege "alter ego" of Dryclean California, which did sign the Agreement containing the forum selection clause. Under these circumstances, the fact that Dryclean Franchise and Dryclean

U.S.A. did not sign the Agreement does not render the forum selection clause unenforceable. (See *TAAG Linhas Aereas de Angola v. Transamerica, Inc.*, (9th Cir. 1990) 915 F.2d 1351, 1354, *Manetti-Farrow, Inc. v. Gucci America, Inc., supra.*, 858 F.2d at 514 fn. 5; *Coastal Steel v. Tilghman Wheelabrator Ltd.* (3d Cir. 1983) 709 F.2d 190, 203. To hold otherwise would be to permit a plaintiff to sidestep a valid [forum selection clause] simply by naming a closely related party who did not sign the clause as a defendant.

*Lu,* 14 Cal. Rptr. 2d at 908

¶47. A Texas appellate court relied on *Lu* in affirming a motion to dismiss, where the contract specified California as both the choice of law and the forum. In doing so, the court held that the plaintiff "waived its right to assert its own inconvenience by agreeing to the valid forum selection clause." *Accelerated Christian Education, Inc. v. Oracle Corp.*, 925 S.W.2d 66, 71 (Tex. App. 1996). In *Accelerated*, the court also found that "[i]n federal court, forum selection clauses have been applied to non-signatories to a contract who are 'transaction participants.'" *Id.* (citing *Brock v. Entre Computer Ctrs., Inc.*, 740 F.Supp. 428, 431 (E.D. Tex. 1990); *Clinton v. Janger*, 583 F.Supp. 284, 290 (N.D. Ill 1984)). In doing so, the *Accelerated* court held:

> We agree with the federal court that a valid forum selection clause governs all transaction participants, regardless of whether the participants were actual signatories to the contract. By transaction participant, we mean an employee of one of the contracting parties who is individually named by another contracting party in a suit arising out of the contract containing the forum selection clause. To hold otherwise would allow a nonsignatory employee, who was a transaction participant, to defeat his company's agreed-to forum by refusing to be bound by the employer's contract. This cannot be. We conclude the trial court may apply a valid forum selection clause to all transaction participants. [footnote omitted] To conclude otherwise would enable a party to bypass a valid forum selection clause by naming in its petition a closely-related party who was not a party to the

17

> contract. See *Lu*, 14 Cal.Rptr.2d at 908. The trial court properly dismissed Accelerated's claims against Brady.

*Accelerated*, 925 S.W.2d at 75. The same standard should apply in the underlying case.

¶48. Delaney and Old South attempt to distance themselves from the Representative Agreement, and establish independent liability under their Producer's Contract with St. Paul. In their cross-claim, Delaney and Old South claim they were independent contractors for HICO. Hood, however, claims that Gerald Delaney was an employee of HICO from the beginning, and remained an employee until Delaney resigned his position with HICO and began representing Zurich, in competition with Titan.

¶49. More importantly, Delaney was a corporate officer of HICO. Old South was formed after Delaney became involved with HICO. He and his partners in Old South acquiesced in Delaney's involvement at HICO. The record shows that both Delaney and Old South profited greatly from the existence of the Representative Agreement. Old South tells us that "Hood and HICO became the sole and exclusive marketing arm for Titan in Mississippi. . . ." Delaney testified and clearly believed that HICO was Titan's "exclusive marketing representative."

¶50. While operating with HICO, whether independent contractor or employee, Delaney and Old South enjoyed the benefits of the Representative Agreement, including HICO's relationship with the Association of Supervisors, and the political connections provided by Hood.

¶51. Old South's primary dispute in this litigation involves the ownership of "expirations" of certain policies. Furthermore, in its cross complaint, Old South's primary allegation against St. Paul was that its agent, Hood, committed wrongful acts, and that the wrongful acts were

18

imputed to St. Paul. Whether St. Paul and/or Hood had a right to approach the various policyholders and solicit renewals requires interpretation and application of the terms of both the Representative Agreement and the Titan/Old South Producers Agreement. Having enjoyed the benefits provided by the Representative Agreement, Old South will not now be allowed to disavow its terms, including the forum selection clause. The extent and quality of Delaney's involvement in HICO, together with his involvement in the operation of HICO under the Representative Agreement, renders both Delaney and Old South "transaction participants" in the Representative Agreement. See discussion of "transaction participants," supra. *See also Lu,* 14 Cal. Rptr. 2d at 908.

¶52. Accordingly, both Delaney and Old South are bound by the forum selection clause of the Representative Agreement. That said, HICO's concern that this matter involves interrelated litigation with other parties not subject to the contract or jurisdiction of Bexar County, Texas, is unfounded. Additionally, HICO/Hood would not be subject to multiple litigation and Bexar County, Texas is the appropriate forum for this litigation.

*Corporate mergers – convenience of the parties*

¶53. HICO and Hood also argue that since Titan – which had its corporate headquarters in Texas – is now owned by St. Paul, whose corporate headquarters is in Minnesota, "the factors that may have made Texas a plausible forum as between Plaintiffs and Titan no longer existed," and Texas has no identifiable interest in the controversy. In their brief, HICO/Hood state:

> Certainly at no time in 1994 could those involved in the negotiation of the representative agreement have contemplated that Hood or HICO would be forced to submit to jurisdiction of Texas courts in litigation against St. Paul, a twice-removed acquirer of Titan.

19

¶54. We find this argument to be disingenuous. For purposes of liability, HICO/Hood had no trouble pursuing Titan (whose offices are still in Texas) and St. Paul, claiming that St. Paul stands in the shoes of Titan. However, when it comes to the forum selection clause, St. Paul is suddenly relegated to a "twice-removed acquirer of Titan." If HICO/Hood wish to pursue litigation against St. Paul based upon its alleged responsibility under the Representative Agreement, they are estopped from denying St. Paul the right to claim the benefit of the forum selection clause.

¶55. As previously stated, the law will not permit a party, when suing or being sued on a written contract, to admit signing the contract, but then to deny that the contract expresses the agreement made. *Busching*, 542 So. 2d at 865.

¶56. HICO/Hood claim that the clause fails to enhance "contract predictability," and that St. Paul really did not care whether the matter was litigated in Texas or not. They submit that Mississippi's interest in the litigation is "great" because the cause of action arose in Mississippi; Hood is a Mississippi citizen; HICO is a Mississippi corporation; most of the witnesses reside in Mississippi; St. Paul has a substantial business presence in Mississippi; and the subject of the litigation -- public entity insurance -- pertains only to Mississippi governmental entities.

¶57. To these claims, St. Paul responds that (1) its public entity business continues to be headquartered in Bexar County, Texas; (2) negotiations took place in Bexar County; (3) at trial (as opposed to pretrial representations to the trial court), HICO called only one witness from Mississippi who was not a HICO employee or expert, called four such witnesses from Texas,

20

and called seven from other states; and (4) of the 103 trial exhibits, 43 originated in Texas, while only 23 exhibits originated in Mississippi.

¶58. The time for consideration of these factors was prior to the execution of the contract. We will not attempt to divine or factor in what could have been or what should have been. The contract states: "For any litigation arising out or [sic] relating to this Agreement, the parties **consent** to the **exclusive** personal jurisdiction and venue of the state and federal courts located in **Bexar County, Texas**, and hereby **stipulate to the convenience** of those forums." (Emphasis added). The causes of action listed in the complaint, the amended complaint, and cross-claim arise out of – or are related to – the Representative Agreement, and we are presented with no argument or reason which persuades us that the forum selection clause contained therein should not be fully enforced.

*Waiver and abandonment*

¶59. Finally, HICO and Hood say that, even if the forum selection clause is enforceable, Titan and St. Paul waived and abandoned their rights under the clause when their counsel stated to the trial court that Titan would be willing to change venue to another Mississippi county.

¶60. Waiver presupposes full knowledge of a right existing, and an intentional surrender or relinquishment of that right. It contemplates something done designedly or knowingly, which modifies or changes existing rights or varies or changes the terms and conditions of a contract. It is the voluntary surrender of a right. To establish a waiver, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right alleged to have been waived. *Ewing v. Adams*, 573 So. 2d 1364, 1369 (Miss. 1990).

21

¶61. The statement made by counsel during oral argument before the trial court does not closely resemble a waiver or abandonment of the forum selection clause. In fact, we are unable to find any language in the record which suggests a waiver. We do find where counsel for St. Paul – expressing concern to the trial court about litigating in Hood's "back yard," – offered to compromise by agreeing to litigate in a different Mississippi county. The offer was rejected by both the trial court and the plaintiffs. Counsel may not now exhume the rejected offer, and re-label it as a "waiver." Had the offer been accepted, we would apply a different analysis which we see no need to discuss here.

¶62. Accordingly, we find that requiring this case to be litigated in Bexar County, Texas, would not be so gravely difficult and inconvenient that HICO and Hood would, for all practical purposes, be deprived of their day in court. Therefore, this *Zapata* factor weighs in favor of enforcing the forum selection clause.

> 3. <u>Whether the enforcement of the clause would contravene a strong public policy of the forum in which the suit is brought, declared by statute or judicial decision.</u>

¶63. In *Tel-Com*, this Court held that public policy would not be violated by the enforcement of a forum selection clause between two commercial parties, negotiating at arm's length, where the clause was not hidden, or in fine print. *Tel-Com.,* 782 So. 2d at 154-155. The Representative Agreement in the case sub judice meets the *Tel-Com* test. We also note that Texas courts enforce valid forum selection clauses, and apply the clause to a closely-related party ("transaction participant") who is not a party to the contract. *Accelerated*, 925 S.W.2d 66.

## CONCLUSION

¶64. Based upon the foregoing, this Court find that the forum selection clause in the Representative Agreement is binding and enforceable. We further find that Old South is a "transaction participant," and is equally bound. The trial court erred when it failed to grant St. Paul's motion to dismiss based on the forum selection clause. Consistent with the language of the forum selection clause, personal jurisdiction and venue in this cause is vested exclusively with the state and federal courts located in Bexar County, Texas. Since this Court has no power to transfer the litigation to Texas, the jury verdict and judgments entered by the Copiah County Circuit Court in favor of HICO, Hood, and Old South are reversed and rendered.

¶65. **REVERSED AND RENDERED.**

**COBB, P.J., EASLEY, JJ., LACKEY AND PRICHARD, SPECIAL JUSTICES, CONCUR. SMITH, C.J., WALLER, P.J., DIAZ, CARLSON, GRAVES AND RANDOLPH, JJ., NOT PARTICIPATING.**