# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01603-COA

**PIERCON, INC. AND DENNIS PIERCE, INC.**　　　　**APPELLANTS/CROSS-APPELLEES**

v.

**BRIERFIELD INSURANCE COMPANY**　　　　**APPELLEE/CROSS-APPELLANT**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/2014 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | RICHARD D. NORTON |
| | LAWRENCE CARY GUNN JR. |
| ATTORNEYS FOR APPELLEE: | L. CLARK HICKS JR. |
| | R. LANE DOSSETT |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| TRIAL COURT DISPOSITION: | JUDGMENT IN FAVOR OF THE APPELLEE IN THE AMOUNT OF $5,328 AGAINST DENNIS PIERCE INC. AND $45,362 AGAINST PIERCON INC., FOR A TOTAL JUDGMENT OF $50,690 |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 04/19/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1.　PierCon Inc. and Dennis Pierce Inc.—both owned and operated by Dennis Pierce and referred to collectively as "Pierce"—dispute the amount of insurance premiums that Brierfield Insurance Company ("Brierfield") charged under two commercial general liability policies. Pierce refused to pay certain premiums because he disagreed with Brierfield's

calculations. Brierfield eventually filed suit to collect the premiums in the County Court of Lamar County. After a trial, the county court found that language in the policies stating that premiums would be calculated in accordance "with our [i.e., Brierfield's] rules and rates" was vague and ambiguous and that Brierfield's methods of auditing and calculating premiums were arbitrary and capricious. The county court recalculated the premiums and entered judgment in favor of Brierfield for the recalculated amount, which was significantly less than Brierfield had demanded.

¶2.     Brierfield appealed to Lamar County Circuit Court, and Pierce cross-appealed. Brierfield claimed that the county court erred by finding its policy language to be ambiguous and by declaring its auditing methodologies and calculations "arbitrary and capricious." Pierce's cross-appeal argued that the county court erred by failing to give him offsetting credit for a premium overpayment that Brierfield failed to refund. The circuit court reversed the county court's decision, finding that the policies were neither vague nor ambiguous and that Brierfield's auditing practices were neither arbitrary nor capricious. Accordingly, the circuit court awarded Brierfield the premiums it sought. On cross-appeal, the court granted Pierce the offset he sought.

¶3.     Both parties appealed from the circuit court's judgment. With respect to the policies' language and proper application, Pierce basically argues that the county court was right and the circuit court erred. On cross-appeal, Brierfield argues that the circuit court should have awarded pre-judgment and post-judgment interest and erroneously granted Pierce an offset

2

based on the premium overpayment.  In the main appeal, we affirm because the circuit court correctly interpreted the policies.  In the cross-appeal, we affirm in part and reverse and remand in part.  We find no abuse of discretion in the circuit court's denial of pre-judgment interest, but Pierce confesses error as to the other two issues raised in the cross-appeal, and we reverse and remand on those issues.

## FACTS AND PROCEDURAL HISTORY

¶4.     Dennis Pierce is owner and operator of two construction businesses, Dennis Pierce Inc. (DPI) and PierCon Inc.  Brierfield Insurance Company issued commercial general liability (CGL) policies to the companies for policy periods covering December 27, 2005, through January 31, 2008.  Pierce paid a deposit premium for each policy.  The declaration page of each policy listed a "total advance premium" and a note that the premium was "subject to audit."  The policies all included the following provision:

> **5.     Premium Audits**
>
> a.     We will compute all premiums for this Coverage Part in accordance with our rules and rates.
>
> b.     Premium shown in this Coverage Part as advance premium is a deposit premium only.  At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured.  The due date for audit and retrospective premiums is the date shown as the due date on the bill.  If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.
>
> c.     The first Named Insured must keep records of the information we need for premium computation, and send us copies at such

3

times as we may request.

¶5.    In 2007 and 2008, Brierfield conducted premium audits to determine earned premiums for the prior policy years.  Based on these audits, Brierfield billed DPI and PierCon for additional earned premiums, but DPI and PierCon refused to pay balances of $11,021 and $45,372, respectively.  Pierce refused to pay these amounts because he claimed that Brierfield had misclassified some of his subcontractors, which resulted in inflated premiums. The parties were unable to resolve the dispute, so in February 2009 Brierfield sued DPI and PierCon in the County Court of Lamar County.

¶6.    The case was tried in February 2010.  Thomas Quaka, a vice president for Brierfield, testified that Brierfield met with Pierce and his representatives in December 2007 to discuss the premium audit, the rates used, and the methodology applied.  Quaka said that Brierfield representatives thoroughly explained the auditing process as well as the documents and materials used to calculate the earned premium.

¶7.    Quaka also described the rules and rates that Brierfield uses in premium audits. Quaka testified that the Insurance Services Office (ISO) is a statistical bureau that files rates, rules, and forms on behalf of insurance companies.  Because Brierfield had filed notice with the Mississippi Insurance Department (MID) that it is an "ISO company," at all relevant times it followed ISO's rates and rules for Pierce's CGL policies and all other similar CGL policies.  ISO's rates and rules are filed with the MID.[1]  Quaka testified that ISO also issues

---

[1] *See* Miss. Code Ann. §§ 83-2-9 & 83-2-15 (Rev. 2011).

Premium Audit Advisory Service (PAAS) bulletins, which provide interpretations of ISO filings for use by all ISO companies. Brierfield follows ISO guidelines and PAAS bulletins when conducting premium audits.

¶8. The dispute in this case centers on the classification of Pierce's subcontractors for purposes of calculating premiums. The classification matters because it determines what portion of payments to subcontractors will be treated as "Payroll" and what portion will be treated as "Total Cost." The allocation between Payroll and Total Cost matters because Total Cost is multiplied by factors ranging from 1.0 to 2.0 per thousand dollars to calculate the premium related to the payment to the subcontractor, whereas Payroll is multiplied by factors ranging from 10 to 100 per thousand dollars to calculate the premium related to the payment. Thus, allocations to Payroll result in higher premiums.

¶9. For insured subcontractors, *all* payments are allocated to Total Cost. It does not appear that there is any dispute in this case regarding insured subcontractors. The parties' dispute concerns uninsured subcontractors. As Quaka explained, Brierfield must treat an uninsured subcontractor as though Pierce's CGL policy covers it—as though its employees are Pierce's—which results in a higher premium for Pierce. With respect to uninsured subcontractors, Brierfield applies the following rules, which are set out in a January 2004 PAAS Bulletin (and in similar form in a 1992 PAAS Bulletin):

- If the actual payroll is available, include only the payroll for employees while they were working on your insured's project(s).

- If the payroll records are not available and the subcontractor supplied

5

labor and materials, not less than 50% and up to 100% of the total cost should be included in the audit. If the insured cannot provide this split, include the entire amount paid to the subcontractor as payroll.

• If the payroll records are not available, and the subcontractor provided labor only, the audit would include not less than 90% of the amount paid to the subcontractor as payroll.

Both Quaka and Brierfield's auditor, James Hobson, testified that Brierfield applies these rules in the manner most favorable to the insured. That is, if payroll records are not available for a labor-and-materials subcontractor, only 50% of the total amount paid to the subcontractor is allocated to payroll; and if payroll records are not available for a labor-only subcontractor, then only 90% of the total amount paid is allocated to payroll.

¶10. Pierce did not believe that Brierfield fairly applied these rules to his uninsured subcontractors. In general, Pierce believed that many of his labor-and-materials subcontractors were improperly classified as labor-only subcontractors, and he believed that the 90% rate was inappropriate for all or almost all of his subcontractors. In a complaint to MID, Pierce claimed that, "[a]fter much research, [he had] verifiable proof that the labor portion of the [sub]contractors in question is actually seventy five percent less than" shown in Brierfield's bills. However, at trial, Pierce admitted that he had never provided any verifiable proof to Brierfield or MID. In fact, he admitted that he had no verifiable records showing that any of the subcontractors provided labor and materials rather than labor only. Rather, Pierce testified that he knew this based on his extensive experience in the industry and common sense.

6

¶11. Quaka and Pierce also testified about their correspondence with MID prior to this litigation. After Pierce met with Brierfield in December 2007, Pierce wrote to MID to complain about Brierfield's methodology. In Pierce's letter, he complained that Brierfield refused to use a 50% rate for his uninsured subcontractors, which was what his workers' compensation insurers used. Quaka responded to MID on behalf of Brierfield and provided documents explaining their auditing processes. Quaka also explained that Brierfield could not apply the same rates as Pierce's workers' compensation carriers because workers' compensation insurance was very different from CGL insurance.

¶12. After receiving these letters, MID responded to Pierce. MID explained their understanding of Brierfield's auditing methodology and rates and stated that they could not "see where Brierfield used an incorrect auditing factor in determining your general liability policy." MID invited Pierce to contact MID's legal department if he had further questions, but Pierce did not do so.

¶13. Hobson also testified at trial. He explained that prior to the audit, Brierfield contacted the bookkeeper for Pierce's companies, Katrina Delancey, and she provided all information regarding payroll and subcontractors. Brierfield used the information provided by Pierce's bookkeeper to determine earned premiums under the policies. Hobson also echoed Quaka's testimony about the rates applicable to uninsured subcontractors. Based on the information provided by Pierce's bookkeeper, Hobson determined that forty-eight of the fifty-three subcontractors were subject to the 90% rate. Hobson testified that if he had been provided

7

with verifiable information that some of the subcontractors were misclassified, Brierfield would have adjusted its final calculation of the premiums owed. However, Pierce never provided any such information. Hobson and Quaka testified that they would have accepted such information at or even after their December 2007 meeting with Pierce. Indeed, Quaka testified that Brierfield still would have accepted such information and adjusted Pierce's premiums at the time of the 2010 trial in the county court.

¶14. Following trial, the county court judge found that the policies' statement that Brierfield would "compute all premiums . . . in accordance with our rules and rates" was vague and ambiguous. Thus, the judge stated that he would construe the language in favor of Pierce, the non-drafter. The judge also found that the use of the 90% rate for labor-only subcontractors was "arbitrary and capricious" and that "[c]ommon sense dictates that subcontractor payments are not 90% payroll." The judge then recalculated the premiums using the 50% rate for all subcontractors. He found that DPI and PierCon owed Brierfield $5,274 and $29,426, respectively. He also awarded 3% post-judgment interest. Brierfield appealed to circuit court, and Pierce cross-appealed.

¶15. On appeal, applying a de novo standard of review, the circuit court reversed the county court's decision. The circuit judge found that the policies' "rules and rates" language was not ambiguous. The judge reasoned that Pierce knew when he purchased the policies that the premiums were subject to adjustment based on an audit. The judge also emphasized that Brierfield had filed notice with MID that it would follow ISO's rates and rules. The

8

judge also found that Brierfield's use of the 90% rate for labor-only subcontractors was not arbitrary or capricious. He noted that Brierfield based its classifications on information that Pierce's companies provided; and although Pierce claimed to have "verifiable proof" that Brierfield's classifications were incorrect, Pierce admitted that he never provided that information to Brierfield, as was his companies' duty under their policies. Accordingly, the circuit judge concluded that the county court erred by imposing the 50% rate.

¶16. In the circuit court, Pierce also argued that Brierfield owed him a credit of $5,693 due to a premium overpayment. During trial, Quaka had acknowledged that Brierfield had not refunded the overpayment. Instead, Brierfield applied the overpayment to another policy, albeit without approval from Pierce. The circuit judge agreed with Pierce that he was entitled to a credit. Thus, the circuit court entered judgment in favor of Brierfield in the total amount of $50,690—the total premiums claimed by Brierfield, less the credit.

¶17. Brierfield filed a motion for clarification of the opinion and for pre-judgment and post-judgment interest. The court corrected a scrivener's error but denied Brierfield's request for pre-judgment and post-judgment interest as "not well taken." Pierce appealed from the circuit court's judgment, and Brierfield cross-appealed.

**DISCUSSION**

¶18. Pierce's appeal to this Court raises one issue only: "Whether an insurance policy's language is ambiguous when it provides that the premium can be adjusted retroactively based on the 'rules and rates' of the insurer and the 'rules and rates' are not defined in the policy."

On cross-appeal, Brierfield argues that the circuit court erred by not awarding pre-judgment or post-judgment interest and by offsetting the amount Pierce owed by $5,693. Pierce now concedes that he was not entitled to the offset and thus confesses error on that issue.

¶19. We affirm the circuit court's determination that the policy language is not ambiguous. We also conclude that the circuit court did not abuse its discretion by denying pre-judgment interest. However, the circuit court erred by denying Brierfield's request for post-judgment interest. Therefore, we remand the case for the circuit court to enter an amended judgment that includes an award of post-judgment interest but not the $5,693 offset.

### I. The Policy Language

¶20. Pierce argues that Brierfield's policies are ambiguous because they say that Brierfield "will compute all premiums . . . in accordance with our rules and rates," but they do not define "our rules and rates." Pierce argues that although Brierfield utilizes ISO guidelines and PAAS bulletins in its premium audits, the policy is ambiguous because it does not expressly reference or incorporate those guidelines or bulletins. Pierce argues that because the policy is ambiguous it must be "interpreted against" its drafter (Brierfield). By this, Pierce means that we should simply apply the 50% rate to all of his uninsured subcontractors because, according to Pierce's testimony at trial, that is customary in his industry and commonly used in audits of workers' compensation policies.

¶21. Brierfield counters that the language is not ambiguous because the policies say that Brierfield will use its "rules and rates," and, according to Brierfield, that is exactly what it

10

did. Quaka testified that Brierfield has identified itself as an ISO company through filings with MID, thereby adopting ISO guidelines and PAAS bulletins. Thus, those guidelines and bulletins have been adopted as part of Brierfield's own "rules and rates."

¶22. "[T]he interpretation of an insurance policy is a question of law," so "we apply a de novo standard of review" to the circuit court's interpretation. *Hayne v. The Doctors Co.*, 145 So. 3d 1175, 1180 (¶10) (Miss. 2014) (quoting *Hankins v. Maryland Cas. Co./Zurich Am. Ins.*, 101 So. 3d 645, 652 (¶15) (Miss. 2012)). "The language and provisions of insurance policies are viewed as contracts and are subject to the same rules of interpretation as other contracts." *Id.* at (¶12). "If a policy is not ambiguous, the court gives effect to its clear and unambiguous meaning." *Chevis v. Miss. Farm Bureau Mut. Ins.*, 76 So. 3d 187, 194 (¶23) (Miss. Ct. App. 2011). "There is an ambiguity in an insurance contract when the policy can be interpreted as having two or more reasonable meanings." *Miss. Farm Bureau Cas. Ins. v. Britt*, 826 So. 2d 1261, 1265 (¶14) (Miss. 2002). However, "[t]he mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Epperson v. SOUTHBank*, 93 So. 3d 10, 16-17 (¶18) (Miss. 2012) (quoting *Delta Pride Catfish Inc. v. Home Ins.*, 697 So. 2d 400, 404 (Miss. 1997)). In addition, "[t]he fact that a term is not defined in the policy itself does not alone make that term ambiguous." *Chevis*, 76 So. 3d at 194 (¶23) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 207 (5th Cir. 2007)).

¶23. Applying these rules to Pierce's arguments, we may first dispense with the notion that

11

the term "rules and rates" is ambiguous simply because it is not defined in the policy. *Chevis*, 76 So. 3d at 194 (¶23). Furthermore, because Pierce has not articulated any reasonable alternative interpretation of the relevant policy language, we fail to see how that language "can be interpreted as having two or more reasonable meanings." *Britt*, 826 So. 2d at 1265 (¶14); *see Chevis*, 76 So. 3d at 194 (¶24) (holding that a policy term was not ambiguous where the insured was "critical of the circuit court's . . . definition, [but he] offer[ed] no other reasonable alternative interpretation of the term"). Indeed, Pierce does not interpret the policy language at all but simply asks us to rewrite the policy to mandate the use of a rate that Pierce considers customary and reasonable.

¶24. However, testimony at trial established that Brierfield filed with MID as an "ISO company" and, therefore, followed ISO rules and rates and PAAS bulletins. Accordingly, when the policies refer to "[Brierfield's] rules and rates," we do not think that they can be interpreted to mean anything other than the rules and rates that Brierfield has adopted by virtue of its filings with MID. No viable alternative interpretation has been suggested.

¶25. Pierce's testimony at trial reflects that his companies' grievance is not truly with the rules and rates used but with the way in which they were applied to Pierce's subcontractors. Pierce does not believe that anything approaching 90% of payments to those subcontractors should have been allocated to payroll. DPI's and PierCon's CGL policies required them to "keep records of the information . . . need[ed] for premium computation," and the PAAS bulletin at issue expressly permits consideration of such records. If Pierce had presented

12

Brierfield with such information, and if Brierfield had refused to consider it, this would have been a very different case. But Pierce admitted he had no such "verifiable proof." More important, Pierce's disagreement with the results of Brierfield's audit does not render the policy itself ambiguous. We agree with the circuit judge that the policy is not ambiguous and therefore affirm with respect to the main appeal.

## II. Pre-judgment Interest

¶26. Brierfield claims that the circuit judge erred by declining to award pre-judgment interest because the damages owed to Brierfield were liquidated and Pierce "intentionally avoided" paying the premiums at issue. The grant or denial of pre-judgment interest is reviewed for abuse of discretion. *Indemnity Ins. of N. Am. v. Guidant Mut. Ins.*, 99 So. 3d 142, 156 (¶39) (Miss. 2012) (citing *Aetna Cas. & Sur. Co. v. Doleac Elec. Co.*, 471 So. 2d 325, 331 (Miss. 1985)).

¶27. Mississippi Code Annotated section 75-17-7 (Rev. 2013) provides the rate of interest to be applied to judgments. It reads:

> All judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.

*Id.* As interpreted by our Supreme Court, "[t]his statute does not *require* judges to award prejudgment interest, but *allows* the judge to determine the date from which interest will be calculated. The judge may determine that interest should be calculated only from the date

13

of the judgment, rather than before." *Indemnity Ins.*, 99 So. 3d at 157 (¶39). Pre-judgment interest may not be awarded unless (1) "the amount due [was] liquidated when the claim [was] originally made or . . . the denial of [the] claim [was] frivolous or in bad faith," *and* (2) the complaint includes a demand for pre-judgment interest. *Id.* at (¶40) (quoting *Upchurch Plumbing Inc. v. Greenwood Util. Comm'n*, 964 So. 2d 1100, 1117 (¶43) (Miss. 2007)). However, "[e]ven a finding of all the required factors does not make an award of prejudgment interest mandatory." *Id.* at 158 (¶43). Rather, even when such an award is permissible, "[w]hether to award prejudgment interest rests in the sound discretion of the trial court." *Id.*; *accord, e.g.*, *Estate of McLemore v. McLemore*, 63 So. 3d 468, 492 (¶75) (Miss. 2011).

¶28. The circuit judge denied Brierfield's motion for pre-judgment interest as "not well taken," without further elaboration, but we may affirm if the record discloses any ground on which the judge might have exercised his discretion to deny pre-judgment interest. *See, e.g.*, *Gates v. Gates*, 616 So. 2d 888, 890 (Miss. 1993). We conclude that the circuit judge did not abuse his discretion in denying pre-judgment interest. Brierfield did not ask for pre-judgment interest in its original complaints in the county court. In fact, it appears that Brierfield first mentioned the issue in the proposed findings of fact and conclusions of law that it filed after trial in the county court. By itself, Brierfield's failure to demand pre-judgment interest in its complaints was a sufficient reason to deny pre-judgment interest. *Indemnity Ins.*, 99 So. 3d at 157 (¶40).

14

### III. Post-Judgment Interest

¶29. Brierfield claims the circuit judge erred by not granting post-judgment interest, which is mandated by section 75-17-7 (quoted in full above). Unlike pre-judgment interest, the Mississippi Supreme Court has held that post-judgment interest is a statutory right and an award is mandatory. *Miss. Dep't of Human Servs. v. McNeel*, 10 So. 3d 444, 460 (¶34) (Miss. 2009) (citing *Miss. Dep't of Mental Health v. Hall*, 936 So. 2d 917, 929-30 (¶¶40-41) (Miss. 2006)). Additionally, Pierce concedes that the circuit judge should have awarded post-judgment interest.

¶30. The circuit judge erred by declining to award post-judgment interest to Brierfield. We therefore remand for the judge to award "fair and reasonable" post-judgment interest. *Bluewater Logistics LLC v. Williford*, 55 So. 3d 148, 164 (¶74) (Miss. 2011).

### CONCLUSION

¶31. We affirm the circuit court's determination that the phrase "rules and rates" as contained in Brierfield's CGL policy is not ambiguous. We also affirm as to the denial of pre-judgment interest. However, we remand for the circuit court to amend the judgment to include an award of post-judgment interest pursuant to Mississippi Code Annotated section 75-17-7 and to eliminate the $5,693 offset erroneously credited to Pierce.

¶32. **THE JUDGMENT OF THE CIRCUIT COURT OF LAMAR COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. ALL COSTS OF THIS APPEAL SHALL BE DIVIDED EQUALLY BETWEEN THE APPELLANTS/CROSS-APPELLEES AND APPELLEE/CROSS-APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, FAIR AND**

15

**GREENLEE, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**