# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00356-COA

**CHRISTOPHER JOSEPH BLANCHARD**                                        **APPELLANT**

**v.**

**TAMMIE LYNN BLANCHARD**                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/19/2021 |
| TRIAL JUDGE: | HON. SHEILA HAVARD SMALLWOOD |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEPHEN J. MAGGIO |
| ATTORNEY FOR APPELLEE: | KIMBERLY-JOY LOCKLEY MIRI |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND RENDERED - 07/25/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., GREENLEE AND SMITH, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     When Christopher (Chris) Blanchard and Tammie Blanchard divorced, they entered into a Child Custody, Support, Visitation and Property Settlement Agreement (PSA) drafted by Tammie's attorney.  The PSA granted Tammie the exclusive use and possession of the former marital home but also granted Chris a right to half the "net proceeds" from a future sale of the home.  Under the PSA, Tammie must put the house on the market when the parties' youngest child turns eighteen, though she may sell the home at any time prior to that point.  The present proceedings arise from Tammie's attempt to sell the house and her contention that by refinancing the home she effectively severed Chris's right to receive any of the proceeds from its sale.  The chancery court ruled that the PSA was ambiguous on this

point, and, based on parol evidence, the court found that Tammie's refinancing of the home "severs [Chris's] interest in the equity in the home." Chris appealed.

¶2. Reviewing this issue of law de novo, we hold that the relevant provision of the PSA is not ambiguous and that Tammie's refinancing of the home did not sever Chris's interest in the net proceeds from a sale of the home. Therefore, we reverse and render the judgment of the chancery court.

## FACTS AND PROCEDURAL HISTORY

¶3. Chris and Tammie were married in 2006 and had two children during their marriage. In 2018, they filed a joint complaint for an irreconcilable-differences divorce based on a PSA that they had signed on February 12, 2018. Tammie's lawyer drafted the PSA, while Chris was unrepresented. The chancery court approved the PSA and incorporated it as part of the final judgment of divorce entered on May 14, 2018. Section 14 of the PSA addressed the marital home:

> The Parties agree that [Tammie] shall be awarded the exclusive and sole use possession and title to the [marital home] and that [Tammie] shall continue to pay the monthly note, taxes and insurance on said home . . . . The Parties agree that [Tammie] shall have exclusive and sole possession and title to the [home] until the Parties' youngest minor child . . . turns eighteen (18) years of age,[1] at which time [Tammie] shall place the [home] on the market and sold for fair market value to be determined by a licensed appraiser. Upon the sale of such property, the current mortgage is to be paid in full and the net proceeds will be divided equally between the Parties.
>
> [Tammie] will attempt to refinance at terms equal to or better than terms on present loan to remove [Chris's] name from the loan. If [Tammie] cannot refinance, then she will attempt to secure such financial loan within two (2)

---

[1] The parties' youngest child was born in June 2014 and therefore will not reach the age of eighteen until June 2032.

2

years from the date of this Agreement at terms equal to or better than terms of present loan. If [Tammie] is still unable to refinance, then [Tammie] will be solely responsible for payment of the loan. [Tammie] shall hold [Chris] harmless in the repayment of this loan.

There is no evidence of the value of the home or its mortgage balance at the time of the divorce because the parties signed and filed a joint waiver of the requirements of Uniform Chancery Court Rule 8.05. Elsewhere in the PSA, the parties agreed that each would keep the automobile and other personal property then in his or her possession and be responsible for any debt in his or her name. There was no marital debt to address other than the mortgage on the marital home. Finally, Chris disclaimed any interest in Tammie's pension through the Teachers' Retirement System of Louisiana.[2]

¶4. Tammie did not refinance the home or remove Chris's name from the loan within two years. But on or about September 14, 2020—two years and seven months from the date of the PSA and two years and four months after the final judgment of divorce—Tammie refinanced the home under a new thirty-year fixed-rate mortgage.[3] Tammie's loan application listed the value of the home as $200,000, and an August 19, 2020 appraisal estimated that the house had a market value of $185,000. Tammie's loan application showed that the home's existing mortgage balance was approximately $139,000.

¶5. Almost immediately after she refinanced the home, Tammie listed it for sale and then entered into a contract to sell the home. Tammie took the position that she was entitled to

---

[2] Tammie had seventeen or eighteen years of service in Louisiana at the time of the parties' divorce and remained employed in Louisiana as a teacher at the time of trial.

[3] Tammie remarried at some point prior to refinancing the home.

3

receive all proceeds from the sale of the home and owed Chris nothing.

¶6. On November 6, 2020, Chris filed a complaint for injunctive relief in the Pearl River County Chancery Court. Chris alleged that he was entitled to half the proceeds from any sale of the home and requested that the court enjoin Tammie from expending the same. Tammie filed an answer and counterclaim for declaratory relief, alleging that she was entitled to all proceeds from the sale because she had refinanced the home.

¶7. The contract to sell the home later "fell through," but both parties requested that the court resolve their dispute regarding the interpretation of the PSA because the issue would arise again in the future.[4] In April 2021, the chancellor entered an interlocutory order concluding that the PSA was ambiguous and that the case would proceed to trial to allow the parties to offer parol evidence regarding the PSA's meaning. The case then proceeded to trial in October 2021. Tammie, Chris, and Tammie's former attorney testified at trial.

¶8. At trial, a prior draft of the PSA was admitted into evidence that showed that some of the language in section 14 was added at Chris's insistence. Specifically, the underlined language below was not in the original draft but was added before the PSA was signed:

> The Parties agree that [Tammie] shall be awarded the exclusive and sole use possession and title to the [marital home] and that [Tammie] shall continue to pay the monthly note, taxes and insurance on said home . . . . The Parties agree that [Tammie] shall have exclusive and sole possession and title to the [home] until the Parties' youngest minor child . . . turns eighteen (18) years of age, at which time [Tammie] shall place the [home] on the market and sold for fair market value to be determined by a licensed appraiser. Upon the sale of such

___

[4] M.R.C.P. 57(b)(1)-(2) ("Any person interested under a . . . written contract . . . may have determined any question of construction . . . arising under the . . . contract . . . and obtain a declaration of rights . . . thereunder. . . . A contract may be construed either before or after there has been a breach thereof.").

4

> property, the current mortgage is to be paid in full and the net proceeds will be divided equally between the Parties.
>
> [Tammie] will attempt to refinance at terms equal to or better than terms on present loan to remove [Chris's] name from the loan. If [Tammie] cannot refinance, then she will attempt to secure such financial loan within two (2) years from the date of this Agreement at terms equal to or better than terms of present loan. If [Tammie] is still unable to refinance, then [Tammie] will be solely responsible for payment of the loan. [Tammie] shall hold [Chris] harmless in the repayment of this loan.

The remainder of section 14 regarding the marital home remained unchanged. Thus, the original draft of the PSA granted Tammie the marital home outright and granted Chris no right to any equity in the home. In contrast, the final PSA granted Chris a right to equity in the home upon the sale of the home.

¶9.     Tammie testified it was her understanding that "the current mortgage" mentioned in this provision referred only to the mortgage on the home at the time of the parties' divorce. Tammie testified that she believed that if she refinanced the home as provided in the second paragraph quoted above, Chris would no longer have a right to any equity in the home under the first paragraph.

¶10.    Chris testified that he wanted Tammie and their children to be able to remain in the marital home after the divorce, but he wanted to preserve his right to the equity in the home. Chris testified that he insisted on a right to equity in the marital home in part because he agreed to disclaim any right to Tammie's pension. Chris testified that he understood and believed that the PSA granted him a right to half the proceeds from the sale of the marital home even if Tammie refinanced the home to remove him from the mortgage. Chris also testified that he had been receiving Social Security Disability Insurance payments for eight-

5

plus years based on a diagnosis of Guillain-Barre syndrome, paralysis, and other ailments.

¶11. Tammie's former attorney, Nathan Farmer,[5] testified that he drafted the PSA based on his discussions with Tammie and that he did not advise Chris regarding the meaning of any of its provisions. Farmer stated he believed that the PSA granted Chris a right to receive proceeds from the sale of the marital home *only* if Tammie did not refinance the home at any point—i.e., either before or after the two-year period set out in the PSA—*and* if Tammie waited until the parties' youngest child turned eighteen to sell the home. Farmer believed that if Tammie refinanced the home or sold it before the child turned eighteen, she would owe Chris nothing. Farmer acknowledged that he never advised Chris regarding the meaning of the PSA.

¶12. After trial, the chancery court entered an opinion and final judgment. The court found that section 14 of the PSA was "ambiguous"; that "the intent of the parties remains unascertainable" even after applying the traditional canons on contract construction; and that based on the testimony and other parol evidence, "the intent of the parties in [section] 14 of the [PSA] was that Tammie's refinanc[ing] of the property in September 2020 sever[ed] [Chris's] interest in the equity in the home." Therefore, the court held that Chris had no right to any proceeds from a sale of the home. Chris filed a motion to alter or amend the judgment, which the chancery court denied, and then appealed.

## ANALYSIS

¶13. Generally, when we "review[] a chancellor's decision in a case involving divorce and

---

[5] Farmer does not represent Tammie in the present proceedings.

all related issues, our scope of review is limited by the substantial evidence/manifest error rule. However, a property settlement agreement is a contractual obligation. Questions of law, such as contract interpretations, are reviewed de novo." *Bryant v. Bryant*, 348 So. 3d 309, 313 (¶9) (Miss. 2022) (quotation marks and citations omitted).

¶14. The Mississippi Supreme Court has held "that a property settlement agreement is no different from any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated in a divorce decree, does not change its character." *Id.* at 316 (¶16) (quotation marks omitted). The Court has further stated:

> Contract interpretation involves a three-step analysis. First, this Court must determine whether the contract is ambiguous, and if it is not, then it must be enforced as written. In this step, the Court analyzes the express wording of the contract and enforces the plain meaning where there is no ambiguity. If the contract is deemed ambiguous, the Court applies the meaning more favorable to the nondrafting party. Third, if the contract's meaning remains ambiguous, the Court will consider extrinsic evidence.

*Id.* (quotation marks, brackets, and citations omitted).

¶15. The chancery court ruled that section 14 of the PSA was ambiguous. In particular, the court reasoned that the meaning of "the current mortgage" was ambiguous and that it was unclear whether Tammie's refinancing of the home extinguished Chris's interest in the net proceeds from a sale. However, we conclude that section 14 is not ambiguous.[6]

---

[6] On appeal, Tammie argues that we lack "appellate jurisdiction" to review the chancellor's ruling that the PSA is ambiguous because Chris did not file a petition for permission to appeal from the chancellor's interlocutory order finding an ambiguity, nor did he specifically mention the chancellor's interlocutory order in his notice of appeal. Tammie's argument is without merit. A litigant is not required to seek an interlocutory appeal in order to preserve an issue for a subsequent appeal from a final judgment. Rather, "an interlocutory order . . . merges with the final judgment . . . and may be considered on direct appeal" from the final judgment. *Creel v. Bridgestone/Firestone N. Am. Tire LLC,*

¶16. We focus our analysis on the language that the parties used in their agreement:

> The Parties agree that [Tammie] shall be awarded the exclusive and sole use possession and title to the [marital home] and that [Tammie] shall continue to pay the monthly note, taxes and insurance on said home . . . . The Parties agree that [Tammie] shall have exclusive and sole possession and title to the [home] until the Parties' youngest minor child . . . turns eighteen (18) years of age, at which time [Tammie] shall place the [home] on the market and sold for fair market value to be determined by a licensed appraiser. Upon the sale of such property, the current mortgage is to be paid in full and the net proceeds will be divided equally between the Parties.
>
> [Tammie] will attempt to refinance at terms equal to or better than terms on present loan to remove [Chris's] name from the loan. If [Tammie] cannot refinance, then she will attempt to secure such financial loan within two (2) years from the date of this Agreement at terms equal to or better than terms of present loan. If [Tammie] is still unable to refinance, then [Tammie] will be solely responsible for payment of the loan. [Tammie] shall hold [Chris] harmless in the repayment of this loan.

¶17. The parties clearly agreed that "[u]pon the sale of [the marital home], the current mortgage is to be paid in full and the net proceeds will be divided equally between the Parties." Thus, the PSA clearly grants Chris a right to half the net proceeds from a sale of the home absent some contrary language in the PSA. *See Epperson v. SOUTHBank*, 93 So. 3d 10, 16 (¶17) (Miss. 2012) (To "determine whether the contract is ambiguous," we "must review the express wording of the contract as a whole.").

¶18. Tammie argues that under the second paragraph quoted above, her refinancing of the home effectively extinguished Chris's right to any equity in the home. We disagree. The second paragraph is a standalone obligation requiring Tammie to remove Chris's name from

950 So. 2d 1024, 1027 (¶9) (Miss. 2007). In addition, Chris's notice of appeal from the final judgment encompassed the chancery court's prior interlocutory order. *Bailey v. Wells Fargo Bank N.A.*, 282 So. 3d 482, 488 (¶19) & n.4 (Miss. Ct. App. 2019).

8

the mortgage loan within two years. It further provides that if Tammie cannot remove Chris's name from the loan, she "will be solely responsible for payment of the loan" and "shall hold [Chris] harmless" for the same. Nothing in that paragraph states that Tammie's refinancing of the home terminates Chris's right to half the net proceeds from a subsequent sale of the home.

¶19. Tammie also argues that the meaning of "the current mortgage" is ambiguous and that it referred only to the mortgage on the home at the time of the parties' divorce. She argues that by refinancing the home, she eliminated the "current mortgage" and, by extension, Chris's right to half the proceeds of any subsequent sale of the marital home. Again, we disagree. To begin with, Tammie's argument that the meaning of "the current mortgage" is ambiguous cannot, in and of itself, establish that her refinancing of the home extinguished Chris's right to the net proceeds from a sale. The phrase "the current mortgage" simply defines what is to be paid from the proceeds of a sale of the home before Chris is entitled to the "net proceeds" from the sale. Nothing in that sentence or paragraph sets out any conditions or circumstances under which Chris will not be entitled to the "net proceeds" from such a sale.

¶20. In context, the phrase "the current mortgage" simply refers to the mortgage on the home when it is sold—i.e., the mortgage in existence "[u]pon the sale of such property." Section 14 of the PSA contemplated that the "current mortgage" at the time of the sale would be either the mortgage on the property at the time of the parties' divorce or an equivalent mortgage that Tammie obtained to replace it—i.e., a mortgage with "terms equal to or better

9

than" the original mortgage. The phrase "the current mortgage" does not undermine Chris's right to receive half the net proceeds upon the sale of the home.

¶21. In summary, the PSA grants Chris an *express* right to half the net proceeds of the sale of the home when it is sold. Nothing in the remainder of the PSA negates that right, either expressly or by implication. Accordingly, applying our de novo standard of review, *Bryant*, 348 So. 3d at 313 (¶9), we hold that the chancellor erred by ruling that Tammie's refinancing of the home extinguished Chris's right to the net proceeds from a sale.

¶22. Moreover, even if there were any ambiguity in the parties' agreement, the Mississippi Supreme Court has held that we "should apply the discretionary 'canons' of contract construction" *before* we consider any "extrinsic or parol evidence" of the parties' intent. *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 753 (¶11) (Miss. 2003). Therefore, to resolve any ambiguity, we would follow the well-established rule "[w]here the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party." *Id.* Here, Chris was the non-drafting party. Indeed, Tammie's lawyer drafted the PSA, and Chris was unrepresented at the time of the divorce. Accordingly, Chris's interpretation of the PSA will be "applied" because, at the very least, it is "one fair reading" of the PSA. *Id.*

¶23. Finally, Tammie argues that Chris's interpretation of the PSA is "inequitable," "unfair," "harsh," and "absurd." She argues that a ruling in Chris's favor will grant him a "windfall" because he will receive half the net proceeds from a sale of the home even if she alone pays the mortgage and maintains the home for fourteen years after the parties' divorce,

10

i.e., until their youngest child turns eighteen in 2032. This argument has multiple flaws. First, Tammie is free to sell the home at any time, allow Chris to recover his equity in it, and then move to a new home in which Chris has no interest. In the alternative, she could offer to buy Chris out by paying him for his equity in the home. Second, the parties' deal does not result in a pure "windfall" to Chris because he cannot access his equity in the home until Tammie decides to sell it. If Tammie chooses to remain in the home until 2032, Chris will be unable to access his equity for fourteen years, during which time he will be unable to use this asset as a down payment on a home of his own or for any other purpose. The deal the parties struck has pluses and minuses for both of them, and it is hardly so one-sided as to be "absurd." Like any other contract, a property settlement agreement should be enforced as written, and we will not modify the parties' contract or relieve one party of obligations thereunder just because the contract seems "improvident" or "unfavorable" in hindsight. *Williams v. Williams*, 37 So. 3d 1196, 1200 (¶¶8-9) (Miss. Ct. App. 2009).

## CONCLUSION

¶24. The PSA is unambiguous. Chris has an express contractual right to half the net proceeds from any future sale of the marital home. Accordingly, the judgment of the chancery court is reversed and rendered.

¶25. **REVERSED AND RENDERED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**