ON WRIT OF CERTIORARI

CARLSON, Presiding Justice,
for the Court:
¶ 1. Carolyn Epperson filed a complaint against SOUTHBank in the Circuit Court of Alcorn County alleging that the bank had breached its contract with her by failing to give her the funds from certain *13 certificates of deposit upon her request. The bank had denied Epperson’s request because she did not present the original certificates. The trial court granted summary judgment for SOUTHBank, finding that contractual language required presentation of the original certificates for withdrawal. Epperson appealed the trial court’s judgment, and we assigned the case to the Court of Appeals. The Court of Appeals reversed the trial court’s judgment and rendered judgment in favor of Epperson. SOUTHBank filed a petition for writ of certiorari, which we granted.
FACTUAL BACKGROUND
¶ 2. This case involves the withdrawal of funds from certain certificates of deposit (CDs) funded by C.K. and Juanita Rick-man for their children, Carolyn Epperson and Randy Thompson. Epperson was C.K.’s daughter from a previous marriage, and Thompson was Juanita’s son from a previous marriage. C.K. and Juanita married and raised Epperson and Thompson as siblings. Epperson referred to Juanita as her mother.
¶ 3. The CDs at issue were opened in 1993 at SOUTHBank in Corinth. The CDs were purchased in the following amounts and held in the following names:
Account No. 9019789 — Issued March 11, 1993, in the name of “C.K. Rickman or Juanita Rickman Trustee for Carolyn Rickman Epperson” with an opening balance of $59,716.02.
Account No. 9019797 — Issued March 11, 1993, in the name of “C.K. Rickman or Juanita Rickman Trustee for Randy Thompson” with an opening balance of $59,716.02.
Account No. 9019810 — Issued March 15, 1993, in the name of “C.K. Rickman or Juanita Rickman Trustees for Carolyn Epperson and Randy Thompson” with an opening balance of $30,748.07.
Account No. 9021984 — Issued in the name of “C.K. Rickman or Juanita Rick-man POD to Carolyn Epperson and Randy Thompson” with an opening balance of $12,356.35. (The issue date cannot be determined from the record.)
¶ 4. Each CD was signed by C.K. Rick-man and Juanita Rickman only. The documents signed by the Rickmans had the following heading on the front: “THIS SIGNATURE CARD GOES WITH YOUR TIME CERTIFICATE OF DEPOSIT NO_YOU MAY REFER TO YOUR CERTIFICATE FOR OTHER DETAILS.” A provision on the back of the signature card required the CD to be endorsed and presented to the bank to make a withdrawal prior to maturity.
¶ 5. C.K. died in December 1999. In January 2000, the beneficiaries of the CDs retitled the first three CDs in the name of “Juanita Rickman or Carolyn Epperson or Randy Thompson.” The fourth CD was retitled “Juanita Rickman POD to Carolyn Epperson and Randy Thompson.”[1] According to Epperson, Juanita called in January 2000 and asked Epperson to come to her house and sign a signature card. Juanita told Epperson this was being done to put Epperson’s name on the CDs. Epper-son had not seen the CDs, so she did not know whose names were on them at that time. Epperson claims that they did not discuss how the CDs would be arranged or how much money was involved, but that Juanita simply gave her a blank index card to sign. Thompson was there also; Thompson and Juanita had already signed the card. Apparently, Juanita, Epperson, and Thompson actually signed a Consumer *14 Account Agreement pertaining to each CD.[2]
¶ 6. By that time, SOUTHBank was using a different form for its signature card. The document was titled “Consumer Account Agreement,” and there was a space on the form to designate the type of account, be it a savings, checking, money market, or time deposit account. SOUTH-Bank used the same document for all accounts. There was no longer a separate form for CDs, as there had been when the accounts were opened in 1993. The language on the back of the new signature card no longer referred to the requirement of presenting the CD for early withdrawal. The relevant language pertaining to withdrawal was as follows:
WITHDRAWALS — Unless otherwise clearly indicated on page 1, any one of you who signs this form including authorized signers, may withdraw or transfer all or any part of the account balance at any time on forms approved by us.... We reserve the right to refuse any withdrawal or transfer request which is attempted by any method not specifically permitted... .Withdrawals from a time deposit prior to maturity or prior to the expiration of any notice period may be restricted and may be subject to penalty....
¶ 7. At some point after C.K.’s death, a family dispute arose among Epperson and her mother and stepbrother. In 2004 or 2005, Thompson sold Juanita’s house. Juanita went to live with Thompson and his wife, Doris. At that time, Epperson was called to get some of her father’s personal items out of Juanita’s house. Among the items was a garbage bag containing personal papers that had been shredded. Epperson went through the bag and found interest statements that had been sent to “C.K. Rickman and Juanita Rickman, trustees for Carolyn Rick-man Epperson.” She literally pieced together the statements and discovered how the CDs had been held.
¶ 8. On February 15, 2005, Epperson went to SOUTHBank and asked for copies of the CDs. She spoke with Margie Franks, Senior Vice President of the Savings Department, who gave her a printout of the CDs that were in Epperson’s name and the amount of each. Franks noted on the printout that one CD would mature in September 2005 and the remaining three CDs would mature in January 2007. Ep-person returned to the bank on October 21, 2005, and spoke with Franks again. Franks gave her another printout listing the CDs, but one CD showed a balance of $0.[3] Franks told Epperson that the CD had been withdrawn on March 8, 2005. Epperson then asked if she could “get [her] part of the money.” Franks told Epperson that she could withdraw the money only if she presented the CDs. Franks testified in her deposition that the bank required a party to present the original CD in order to withdraw funds. Franks said she did not know if that policy was in writing, but it had been the bank’s requirement for the forty-six years she had worked at SOUTHBank.
¶ 9. On February 17, 2006, Juanita, Randy, and Doris went to SOUTHBank, closed the three remaining CDs (prior to the maturity date), and consolidated them into *15 one new CD. Franks testified that Juanita signed a withdrawal slip and presented the original CDs, as required, to cash in the three CDs. The amount of the new CD was $234,164.05, and it was in the name of “Juanita Rickman or Randy Thompson or Doris Thompson.” Epperson called Franks sometime later and was told that her name had been removed from all of the CDs.
PROCEDURAL HISTORY
¶ 10. On October 16, 2008, Epperson filed a complaint against SOUTHBank in the Circuit Court of Alcorn County. Ep-person alleged that SOUTHBank had breached its contract with her by failing to give her the funds from the CDs when she asked for them on October 21, 2005. She alleged the bank had a duty to provide her access to the funds and that the bank had breached its duty, resulting in her total loss of the funds.[4] She sought the full amount of the consolidated CD ($234,-164.05) plus interest, punitive damages, and attorney’s fees.
¶ 11. SOUTHBank filed a motion for summary judgment and argued that the “Account Agreements executed in connection with the Certificates of Deposit require that the Certificates themselves be presented to bank representatives before the monies can be withdrawn.” Therefore, according to SOUTHBank, because Epper-son admittedly never was in possession of the CDs, she did not have authority to withdraw the funds, and her claims were without merit.
¶ 12. Epperson responded and filed a cross-motion for summary judgment. Ep-person claimed that SOUTHBank was referencing the 1993 CDs, which included language requiring the CDs to be presented, but that the agreement signed by Ep-person in 2000 did not include that language. After a hearing on the motions, the trial court granted SOUTHBank’s motion for summary judgment and denied Epperson’s cross-motion for summary judgment, finding that, based on the language in the agreement, Epperson was required to present the original certificates for withdrawal. The trial court focused on the “forms approved by us” language in the agreement and held that the agreement required the “presentation” of forms approved by the bank, which it interpreted to be the original CDs.
¶ 13. Epperson appealed the trial court’s decision. The Court of Appeals reversed and rendered, finding that the agreement did not require presentation of the original CDs. The Court of Appeals awarded Epperson the value of the CDs on October 21, 2005, the date she tried to withdraw the funds, plus interest accrued since that date. Epperson v. SOUTHBank, 93 So.3d 26 (Miss.Ct.App.2011), reh’g denied (Nov. 1, 2011). SOUTHBank filed a petition for writ of certiorari, and the Mississippi Bankers Association filed an amicus brief in support of SOUTHBank. This Court granted the petition. Epperson v. SOUTHBank, 80 So.3d 111 (Table) (Miss.2012).
DISCUSSION
¶ 14. In its petition for writ of certiora-ri, SOUTHBank contends that it reserved its right to restrict early withdrawal of a CD through the “may be restricted” language in the agreement, and that SOUTHBank’s restriction was to require presentation of the original CD. The issue presented by SOUTHBank is whether lan *16 guage in a bank customer agreement, which says early withdrawal “may be restricted,” can be enforced only if the restrictions in question are more specifically stated. SOUTHBank asserts that interpretation of the “may be restricted” language is an important issue in banking and finance. We now consider whether the Court of Appeals erred by reversing the trial court’s grant of summary judgment and awarding Epperson the full amount of the certificates. This Court applies a de novo standard of review to a circuit court’s grant or denial of summary judgment. Kilhullen v. Kan. City S. Ry., 8 So.3d 168, 174 (Miss.2009).
A. Certificate of Deposit
¶ 15. A certificate of deposit is “an instrument containing an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money.” Miss.Code Ann. 75-3-104(j) (Rev. 2002). It is generally accepted that a CD is “a note of the bank, payable only according to its terms.” Washington County Mercantile Bank v. Kennedy, 855 S.W.2d 520, 522 (Mo.Ct.App.1993); Holloway v. Wachovia Bank & Trust Co., N.A., 333 N.C. 94, 423 S.E.2d 752, 757 (1992). The terms and provisions of the CD create a contract, which “determines the manner in which the funds of the depositor may be withdrawn and is subject to the law of contracts.” Gary v. FDIC, 981 F.2d 1256, *2 (5th Cir.1992) (quoting Ames v. Great Southern Bank, 672 S.W.2d 447, 449 (Tex.1984) (citations omitted)). See also Washington County Mercantile Bank, 855 S.W.2d at 522. Thus, CDs are governed by contract law rather than by Article 3 of the Uniform Commercial Code. Miss.Code Ann. §§ 75-3-102(a), 75-3-104(d) (Rev.2002). See Estate of Isaacson v. Isaacson, 508 So.2d 1131, 1134 (Miss.1987); DeJean v. DeJean, 982 So.2d 443, 447 n. 1 (Miss.Ct.App.2007).
B. Contract Interpretation
¶ 16. A de novo standard of review is applied to questions of contract construction. A & F Properties, LLC v. Madison County Bd. of Supervisors, 933 So.2d 296, 301 (Miss.2006). This Court’s standard regarding review and interpretation of contracts is well-established. Judicial review and interpretation of a contract involves a three-step analysis. Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc., 857 So.2d 748, 752 (Miss.2003).
¶ 17. First, we must determine whether the contract is ambiguous, and if it is not, then it must be enforced as written. Id. In making that determination, the Court must review the express wording of the contract as a whole. Cherokee Ins. Co. v. Babin, 37 So.3d 45, 48 (Miss.2010). If the contract is unambiguous, “the intention of the contracting parties should be gleaned solely from the wording of the contract” and parole evidence should not be considered. Turner v. Terry, 799 So.2d 25, 32 (Miss.2001) (citing Heritage Cablevision v. New Albany Elec. Power Sys., 646 So.2d 1305, 1312 (Miss.1994)). This Court must “accept the plain meaning of a contract as the intent of the parties where no ambiguity exists.” A & F Properties, 933 So.2d at 301 (quoting Ferrara v. Walters, 919 So.2d 876, 882 (Miss.2005)). “ ‘An instrument that is clear, definite, explicit, harmonious in all its provisions, and is free from ambiguity’ will be enforced.” Zumwalt v. Jones County Bd. of Supervisors, 19 So.3d 672, 685 (Miss.2009) (quoting Pursue Energy Corp. v. Perkins, 558 So.2d 349, 352 (Miss.1990)).
¶ 18. “The mere fact that the parties disagree about the meaning of a *17 provision of a contract does not make the contract ambiguous as a matter of law.” Delta Pride Catfish, Inc. v. Home Ins. Co., 697 So.2d 400, 404 (Miss.1997) (quoting Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416, 419 (Miss.1987)). “Where the contract is unambiguous, the ‘parties are bound by the language of the instrument.’ ” Id. Courts should not alter the terms of a valid contract. “The right of persons to contract is fundamental to our jurisprudence and absent mutual mistake, fraud[,] and/or illegality, the courts do not have the authority to modify, add to, or subtract from the terms of a contract validly executed between two parties.” Wallace v. United, Miss. Bank, 726 So.2d 578, 584 (Miss.1998) (quoting First Nat'l Bank of Vicksburg v. Caruthers, 443 So.2d 861, 864 (Miss.1983)). “With limited exceptions, persons enjoy the freedom to contract. When they do, they are bound by the terms of their contracts.” Titan Indem. Co. v. Hood, 895 So.2d 138,147 (Miss.2004). See also Miss. Hill & Delta Sav. & Loan Ass’n v. Valley Bank, 392 So.2d 1126, 1129 (Miss.1981) (“... courts will not limit freedom to contract except under certain situations such as the provision being against public policy, made under fraud or duress, and other considerations such as ... unreasonableness of the contract provision.”).
¶ 19. Second, if the Court is unable to ascertain the meaning of the contract and the intent of the parties within the “four corners” of the contract, we will apply the “canons of contract construction.” Cherokee Ins., 37 So.3d at 48. “Where the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party.” Royer Homes, 857 So.2d at 753. Third, if the meaning of the contract is still ambiguous, only then is extrinsic evidence considered. Id. “It is only when the review of a contract reaches this point that prior negotiation, agreements^] and conversations might be considered in determining the parties’ intentions in the construction of the contract.” Id. The par-ol evidence rule “provides that where a document is incomplete parol evidence is admissible to explain the terms but, in no event, to contradict them.” Busching v. Griffin, 542 So.2d 860, 865 (Miss.1989).
¶ 20. In a summary judgment case, the reviewing Court need not go through the entire three-step analysis; the Court should determine only whether the contract is ambiguous. Questions of contract construction and ambiguity are “questions of law that are committed to the court rather than questions of fact committed to the fact finder.” Royer Homes, 857 So.2d at 752-53 (internal citations omitted). If the reviewing Court finds the terms of the contract to be ambiguous or subject to more than one interpretation, the case must be submitted to the trier of fact, and summary judgment is not appropriate. Id. See also Pursue Energy, 558 So.2d at 354.
¶ 21. The trial court held that the contract at issue was unambiguous and found that it required presentation of the original CDs. If the trial court was correct that the contract was unambiguous, then summary judgment was appropriate. Only in the event that this Court determines that the contract is unambiguous can the judgment of the trial court be affirmed. If the contract is ambiguous, interpretation of the contract is an issue for the trier of fact.
¶ 22. Although not specifically stated in its opinion, the Court of Appeals clearly found the contract to be ambiguous because it applied the canons of contract construction and used parol evidence to interpret the contract. The Court of Appeals held that the phrase “on forms ap *18 proved by us” did not “indicate on its face that the original CDs must be presented or signed.” Epperson, 93 So.3d at 31. The Court of Appeals then applied the canons of construction by construing the ambiguity against the drafter. Id. The Court of Appeals also considered the difference in the 1993 agreement as well as testimony by Franks, which is parol evidence. Id. Thus, we first recognize that the Court of Appeals erroneously reversed and rendered the trial court’s decision. If the Court of Appeals found the contract to be ambiguous, the matter should have been remanded to the trial court. Contractual ambiguities are questions to be determined by the trier of fact. Royer Homes, 857 So.2d at 753; Pursue Energy, 558 So.2d at 354.
C. SOUTHBank Agreement
¶ 23. Throughout the summary judgment proceedings, the parties and the trial court focused on the “forms approved by us” language in the agreement. The “may be restricted” language was discussed, but it was not the focus of the arguments or the trial court’s decision. In its brief to the Court of Appeals, SOUTHBank emphasized the “may be restricted” language, but the Court of Appeals continued to focus on the “forms approved by us” language. In its amicus brief, the Mississippi Bankers Association focuses on “[w]e reserve the right to refuse any withdrawal ... which is attempted by any method not specifically permitted.” This case does not turn on any one of these phrases in the contract; the entire contract must be interpreted as a whole. “Particular words should not control; rather, the entire instrument should be examined.” Pursue Energy, 558 So.2d at 352 (internal citations omitted). This Court now reviews the entire contract, without applying the canons of construction or considering parol evidence, to determine whether the contract is ambiguous.
¶ 24. The Court of Appeals held that “[a]bsent specific language requiring that the original CDs be presented for withdrawal, we must find in favor of Epperson.” Epperson, 93 So.3d at 31. However, the Court of Appeals cited no authority in support of the position that such a requirement must be specifically stated or that a general statement that restrictions may be imposed is insufficient. “There is little statutory authority or case law on what a certificate of deposit must contain.” In re Estate of Temple, 780 So.2d 639, 641 (Miss.2001). The relevant provisions in the SOUTHBank agreement are broad and general “boilerplate” contract language. While specific provisions control over general provisions, where there is no specific provision, boilerplate language certainly is enforceable. Titan Indem., 895 So.2d at 147.
¶ 25. SOUTHBank argues that the bank had a right to impose restrictions on early withdrawal of funds based on the language in the agreement. Both SOUTHBank and the Mississippi Bankers Association argue that this decision will have far-reaching implications, because the form used by SOUTHBank was a standard form, which contains general language that is commonly used in banking agreements. SOUTHBank argues that “[t]he need for flexibility is shown by the decisions of courts around the country who have recognized both the usefulness and importance of similar general language restricting withdrawal of time deposits.” SOUTHBank relies primarily on three cases: Karu v. Feldman, 119 N.J. 135, 574 A.2d 420 (1990), Washington County Mercantile Bank v. Kennedy, 855 S.W.2d 520 (Mo.Ct.App.1993), and Ayala v. Jamaica Savings Bank, 121 Misc.2d 564, 468 N.Y.S.2d 306 (N.Y. Sup.Ct., Queens County 1983). Ep- *19 person did not discuss these cases in her response, except to say that they are based on old law and do not apply to this case. Epperson did not cite any cases or other authority in support of her position on this point. While the cases cited by SOUTHBank do indicate some degree of flexibility in a bank’s drafting of contracts, the cases are not exactly on point. Regardless, this Court must determine only whether the terms of the agreement are ambiguous.
¶ 26. A contract is ambiguous if it is “susceptible] to two reasonable interpretations.” Dalton v. Cellular South, Inc., 20 So.3d 1227, 1232 (Miss.2009) (internal citations omitted).
An “ambiguous” word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in the particular trade or business.
Id. (quoting Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir.1987) (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987, 994 (S.D.N.Y.1968))). We find that the language in SOUTHBank’s Consumer Account Agreement is not susceptible to more than one interpretation and, therefore, is not ambiguous.
¶ 27. The agreement clearly states that early withdrawals “may be restricted and may be subject to penalty.” As a restriction on early withdrawal, SOUTHBank requires the original CDs to be presented, and the bank is within its rights to do so under the terms of the agreement. The agreement also provides that SOUTHBank reserves “the right to refuse any withdrawal or transfer request which is attempted by any method not specifically permitted.” The method permitted by SOUTHBank for withdrawal of funds from a CD is presentation of the original certificates. If the consumer does not comply with that method for withdrawal, SOUTH-Bank can refuse the request, as it did when Epperson tried to withdraw the funds without presenting the original certificates.
¶ 28. Epperson claims that such a restriction must be in writing because the agreement provides, “These terms govern the operation of this account unless varied or supplemented in writing.” This claim is without merit. The terms of the agreement already provide that early withdrawal of time deposits “may be restricted.” Thus, the customer is already on notice that restrictions may be imposed on early withdrawals. Epperson did not cite any authority in support of this argument, and this Court finds no requirement that such restrictions must be specifically stated.
¶ 29. Although the language in the agreement does not explicitly require the presentation of the original CDs, as the trial court concluded, the agreement does allow the bank to require certain forms to be used, to implement restrictions and impose penalties on early withdrawals, and to refuse a request for withdrawal if the consumer does not comply with the method permitted for withdrawal. These contractual provisions do not contradict one another or lead to inconsistent results.
¶ 30. Without question, the record reveals that Epperson’s relationship with Juanita, Randy, and Doris was contentious. But any liability that may be imposed on Juanita, Randy, and Doris based on their conduct concerning the handling of the subject CDs is not an issue before us today. We can only address Epperson’s breach of contract claims asserted against SOUTHBank, which we have now done.
*20 CONCLUSION
¶ 31. Based on our discussion today, we find that the contractual language pertaining to withdrawals gave SOUTHBank discretion to require certain forms to be used for withdrawal, to refuse or restrict early withdrawals, and to assess penalties for early withdrawal. These terms are consistent and allow SOUTHBank to require presentation of the original CD or CDs for withdrawal. The contract is unambiguous, and the trial court’s grant of summary judgment was appropriate.
¶ 82. THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE CIRCUIT COURT OF ALCORN COUNTY IS REINSTATED AND AFFIRMED.
WALLER, C.J., DICKINSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.

. "POD” means payable on death.

. Although Epperson claimed she signed only a blank index card, she did admit that the signature on the Consumer Account Agreement was hers, but she did not know how it got there. However, that was not an issue in this case.

. The CD with a $0 balance was the CD that had been retitled "Juanita Rickman POD to Carolyn Epperson and Randy Thompson,” which would have matured in September 2005.

. Epperson did not allege wrongdoing on the part of Juanita, Randy, and Doris for closing the three remaining CDs and consolidating them into one CD in only their names. Nor did Epperson assert wrongdoing by SOUTH-Bank for allowing that to be done.