# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00698-COA

**WALTERS INVESTMENTS, INC.**                                    APPELLANT

**v.**

**ROBERT H. SPELL**                                                APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/08/2020 |
| TRIAL JUDGE: | HON. CYNTHIA L. BREWER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | DAVID RINGER |
| | BRENTON MATTHEW CARTER |
| ATTORNEYS FOR APPELLEE: | MARK C. CARROLL |
| | KELLY McREYNOLDS McLEOD |
| | MARY CLARK JOYNER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 10/19/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., GREENLEE AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     Walters Investments Inc. (Walters) appeals the Madison County Chancery Court's grant of summary judgment to Robert Spell.  On appeal, Walters argues the chancellor erroneously (1) resolved disputed facts in Spell's favor; (2) misconstrued the terms of the parties' purchase agreement; (3) required Walters to prove that Spell had breached the implied duty of good faith and fair dealing; (4) failed to grant Walters's request for specific performance; and (5) found Walters had a duty to mitigate its damages.

¶2.     Upon review, we find no error in the chancellor's determination that Walters

presented no genuine issues of material fact or in her grant of summary judgment to Spell on the claims of breach of contract and breach of the implied covenant of good faith and fair dealing. Because we affirm the chancellor's grant of summary judgment to Spell, we decline to address Walters's remaining arguments that the chancellor erred by denying its request for specific performance and by finding it had a duty to mitigate its damages. Accordingly, we affirm the chancellor's judgment.

**FACTS**

¶3. Walters operates a Little Caesar Enterprises Inc. (Little Caesar) franchise (the franchise) in Madison, Mississippi. To become a Little Caesar franchisee, Walters had to meet certain requirements, obtain Little Caesar's approval, and sign the Little Caesar's franchise agreement (the franchise agreement). Relevant to the present appeal, the franchise agreement provided the following requirements regarding restaurant refurbishment and the transfer of any franchise interest:

> 5.6 Refurbishing the Restaurant: Unless sooner required by Franchisee's lease, at any time after the fifth (5th) year of the term, Franchisee shall, at Little Caesar's request, refurbish the Restaurant premises at Franchisee's expense, to conform to the building design, trade dress, color schemes, and presentation of the Proprietary Marks in a manner consistent with the then-current public image for new or remodeled Restaurants, including, without limitation, replacement or renovation of fixtures; remodeling, redecoration, and modifications to existing improvements and reasonable structural changes, provided, however, that the cost to Franchisee for such refurbishment shall not exceed Fifty Thousand ($50,000) Dollars.
>
> . . . .

2

12.2.6 The transferee, at its expense, shall within the time specified by Little Caesar, refurbish, remodel, or otherwise change the Restaurant premises to conform to the then-current standards and specifications of the System;

12.2.7 The transferor shall remain liable for all of the obligations to Little Caesar in connection with the Restaurant that arose prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by Little Caesar to evidence such liability . . . .

¶4. In 2016, Walters's designated corporate representative, Mary Walters Gaudet, entered into negotiations to transfer the franchise to Spell. On October 21, 2016, the parties signed a purchase agreement, drafted solely by Walters and its attorney, to transfer Walters's "right, title, and interest" in the franchise to Spell in exchange for $399,000. With one specified exception, the purchase agreement incorporated the terms and requirements of the franchise agreement between Little Caesar and Walters.[1]

¶5. Relevant to Walters's arguments on appeal, the purchase agreement stated the following:

The Transferee represents that it has satisfied itself with the extent of compliance of Transferor with regard to all obligations unto Little Caesar Enterprises, Inc., with underset agreement, and that all future obligations will be obligations that are exclusively born[e] by Transferee and, in any event, will be paid by Transferee, both for benefit for Transferee, and for benefit of Transferor, if any benefit there is.

. . . .

---

[1] Although the franchise agreement had provided that Walters, as the transferor, would pay a $5,000 fee associated with the transfer, the parties' purchase agreement specifically required Spell to pay the fee.

3

Witness this agreement, effective as to transfer when executed by both parties and thereafter approved by Franchisor and funded by Transferee.

¶6.    Although the parties executed the purchase agreement on October 21, 2016, Little Caesar still required Spell to complete a preapproval process before it would consider him as a potential franchisee.  While Spell was still completing the preapproval process, a dispute arose between the parties regarding the obligation contained in section 5.6 of the franchise agreement to remodel the franchise by December 31, 2017.  Each party asserted that under the purchase agreement and incorporated franchise agreement, the other party bore sole responsibility for the remodel obligation and the associated out-of-pocket cost.  The parties failed to reach an agreement regarding the remodel obligation, and on April 13, 2017, Walters filed a complaint against Spell for breach of contract.  Walters asserted that the parties' purchase agreement had transferred the remodel obligation and associated cost to Spell, who had breached the purchase agreement when he refused to perform his contractual obligations.  Walters contended that monetary damages would be insufficient to remedy Spell's breach, and it therefore asked that in addition to monetary damages the chancellor award specific performance of the contract.

¶7.    On May 15, 2017, Spell moved to dismiss Walters's complaint for failure to state a claim under Mississippi Rule of Civil Procedure 12(b)(6).  Spell argued that the franchise agreement between Walters and Little Caesar had contained a number of contingencies that had to be met before the parties' purchase agreement could become valid.  Spell further argued that Walters's failure to satisfy the franchise agreement's contingencies voided the

4

attempted transfer of the franchise. Spell contended that under the express terms of the franchise agreement, Walters's duty to remodel had arisen prior to the execution of the parties' purchase agreement and that the obligation had remained solely Walters's responsibility because the purchase agreement had not transferred the obligation to him. Spell asserted that he had relied on the plain language of both the parties' purchase agreement and the incorporated franchise agreement when he signed the October 21, 2016 purchase agreement. He therefore contended that Walters's complaint against him should be dismissed. By order entered on October 4, 2017, the chancellor denied Spell's motion to dismiss.

¶8. During discovery, the parties deposed each other as well as Daniel Ducharme, the director of franchise development for Little Caesar. After being notified of the negotiations between Walters and Spell, Ducharme stated he had emailed both parties on September 8, 2016, and had outlined "the process and documents required to receive Little Caesar['s] approval to transfer the franchise rights and obligations." Ducharme explained during his deposition that by the end of 2015, which was well before the parties began their negotiations, Little Caesar had decided a remodel would be "a general requirement for all locations" and had thereafter notified franchisees, including Walters, about the upcoming remodel and associated cost estimate. According to Ducharme, Little Caesar had communicated the remodel requirement to franchisees multiple times through various avenues, including an online forum for franchisees, national conferences, and meetings.

¶9.    In its discovery responses, Walters admitted that the parties' purchase agreement did "not mention [the] costs associated with [the] remodeling obligation." Even so, Walters asserted that both parties knew before they signed the October 21, 2016 purchase agreement that Little Caesar required the franchise to be remodeled by December 31, 2017. To support its contention that Spell knew about the remodel obligation prior to signing the purchase agreement, Walters offered hearsay testimony from Gaudet. Gaudet provided no direct testimony about conversations she had with Spell about the remodel obligation. Instead, Gaudet claimed Ducharme had told her in September 2016 that he spoke with Spell that very month about the remodel requirement. As a result of Ducharme's alleged statements, Gaudet asserted she knew the remodel obligation had been discussed with Spell, although she was unsure exactly when Spell had first learned about the associated cost of the remodel.

¶10.    Despite Gaudet's testimony, Ducharme stated he had no recollection of ever telling her that he spoke with Spell in September 2016 about the remodel obligation. Even after the parties signed the purchase agreement, Ducharme stated that Little Caesar still did not consider Spell to be a franchisee until he completed certain additional requirements. As part of the approval process, Spell and his son Robby traveled to Little Caesar headquarters in Detroit, Michigan, in December 2016. While in Detroit, Spell and Robby met with Ducharme, conducted interviews, and learned more about becoming a possible Little Caesar franchisee.

¶11.    According to Spell, he first learned about the remodel obligation and the associated

cost during his December 2016 meeting with Ducharme in Detroit. Ducharme testified that he usually took potential franchisees to lunch at an updated Little Caesar location to explain the meaning and concept of an "I7" store, which referred to the remodeled version of a Little Caesar franchise. Spell stated that Ducharme informed him during their meeting that the remodel obligation would likely cost $60,000 out of pocket to complete. Spell testified that the remodel obligation was never discussed in his negotiations with Walters prior to the parties signing the purchase agreement.

¶12. Ducharme stated that he recalled Spell's surprise when they discussed the cost of the remodel during their December 2016 meeting. When Walters's attorney questioned Ducharme about his December 2016 meeting with Spell, the following exchange occurred:

Attorney: And did you understand that when . . . Spell left [Little Caesar headquarters], he knew that it would be his responsibility to discharge the remodeling chore if he acquired the franchise?

Ducharme: No.

Attorney: Who did you think would do it?

Ducharme: It's—just that it had to be done. We did not dictate at any[ ]time who did it.

As Ducharme explained, Little Caesar did not dictate which party bore the responsibility for all the obligations contained within the franchise agreement, just that the requirements had to be met to successfully complete the transfer-of-interest process.

¶13. After his trip to the Little Caesar headquarters in Detroit, Spell returned to Mississippi and spoke with a certified public accountant (CPA) about the effect of the added $60,000

7

remodel expense on his deal with Walters. After taking into consideration the salary Spell wanted to pay Robby to manage the franchise, the monthly profit Spell hoped the franchise would make, and the amount Spell wanted to pay back on the business loan each month, the CPA told Spell that his goals could no longer be accomplished after factoring in the additional $60,000 out-of-pocket expense. Despite the CPA's opinion, Spell testified that he was still willing to move forward with the transfer of the franchise if Walters agreed to split the $60,000 remodeling cost with him. Gaudet testified, however, that she never responded to a text message Spell sent about splitting the remodel expense because she did not believe that was part of her contractual obligation. After Gaudet's refusal to split the cost of the remodel with him, Spell stated that he then felt the deal between the parties was terminated.

¶14. Following the completion of discovery, Spell moved for summary judgment under Mississippi Rule of Civil Procedure 56. After a hearing, the chancellor entered an order on October 21, 2019, granting summary judgment to Spell. The chancellor found that, as Walters had admitted during discovery, the parties' purchase agreement and the Little Caesar franchise agreement were unambiguous. The chancellor further found no genuine issue of material fact existed that (1) Walters knew about the remodel obligation and the associated cost prior to the parties' execution of their purchase agreement; (2) Walters failed to notify Spell of the remodel obligation; (3) the plain language of the franchise agreement held Walters liable for all franchise obligations until the effective date of a transfer; and (4)

8

because no effective transfer had occurred, Walters remained liable for the remodel obligation. The chancellor therefore concluded that Spell was entitled to a judgment as a matter of law. Walters filed an unsuccessful motion for the chancellor to reconsider the grant of summary judgment to Spell. Aggrieved, Walters appeals.

## STANDARD OF REVIEW

¶15. We review the chancellor's grant of summary judgment de novo. *Yoakum v. Smith (In re Est. of Yoakum)*, 311 So. 3d 686, 689 (¶9) (Miss. Ct. App. 2021). "The moving party bears the burden to show that no genuine issue of material fact exists," and we view the evidence "in the light most favorable to the nonmovant." *Id.* The trial court properly grants summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). Where the movant supports his summary judgment motion as required, the nonmovant "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." M.R.C.P. 56(e). "[A] fact is neither material nor genuinely contested merely because one party proclaims it so." *Brown Lakeland Props. v. Renasant Bank*, 243 So. 3d 784, 790 (¶17) (Miss. Ct. App. 2018) (quoting *Suddith v. Univ. of S. Miss.*, 977 So. 2d 1158, 1167 (¶10) (Miss. Ct. App. 2007)). Rather, "[a] dispute is 'genuine' where 'the evidence is such that a reasonable jury could return a verdict for the

9

nonmovant.'" *Id.* (quoting *Frazier v. McDonald's Rests. of Miss. Inc.*, 102 So. 3d 341, 345 (¶21) (Miss. Ct. App. 2012)).

¶16.    We likewise apply a de novo standard of review to questions of contract interpretation. *Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 734 (¶34) (Miss. 2019). In "cases involving contractual ambiguity[,]" our caselaw holds that "[s]ummary judgment is generally inappropriate . . . ." *Sweet v. TCI MS Inc.*, 47 So. 3d 89, 91 (¶11) (Miss. 2010); *see also Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 354 (Miss. 1990) ("In summary judgment cases in which a contract . . . was deemed ambiguous within its 'four corners,' this Court on several occasions has held that ultimate disposition (i.e., construction of contractual provisions) generally involves triable issues of fact and, thus, disposition is inappropriate at summary judgment stage."). As this Court has previously explained,

> a trial court may grant summary judgment on a contractual issue only if no genuine issue of material fact arises, and no ambiguity exists in the contract. Hence, based on our de novo review, if this Court finds no ambiguity in the contract, then the trial court's grant of summary judgment stands. However, if this Court finds the contract to be ambiguous, then we must also determine that the summary judgment is inappropriate, as contractual ambiguities are questions to be determined by the trier of fact.

*Cypress Springs LLC v. Charles Donald Pulpwood Inc.*, 161 So. 3d 1100, 1104 (¶12) (Miss. Ct. App. 2015) (citations omitted).

## DISCUSSION

### I.    Genuine Issue of Material Fact

¶17.    Walters argues the chancellor improperly resolved a genuine issue of material fact in

Spell's favor. According to Walters, conflicting evidence existed as to when the parties, and especially Spell, first learned about the remodel obligation. As a result, Walters asserts that the chancellor erred by finding that it had notice of the remodel obligation prior to signing the purchase agreement while also concluding that Spell lacked any such notice of the requirement until after the agreement had been signed.

¶18. We agree with Walters that the date Spell received notice of the remodel obligation is material to the parties' underlying litigation. As stated, the parties' purchase agreement provided the following:

> The Transferee represents that it has satisfied itself with the extent of compliance of Transferor with regard to all obligations unto Little Caesar Enterprises, Inc., with underset agreement, and that all future obligations will be obligations that are exclusively born[e] by Transferee and, in any event, will be paid by Transferee, both for benefit for Transferee, and for benefit of Transferor, if any benefit there is.

Thus, if Spell knew about the uncompleted remodel obligation when he signed the purchase agreement but nevertheless agreed he was "satisfied . . . with the extent of [Walters's] compliance" with "all [its] obligations unto Little Caesar[,]" he would have assumed the obligation and waived his right to insist that Walters complete the remodel in the future. Despite the material nature of this issue, however, we conclude no genuine dispute of fact actually exists that Spell only learned of the remodel obligation after he signed the purchase agreement with Walters.

¶19. During her deposition, Walters's corporate representative, Gaudet, offered uncorroborated hearsay evidence to support the assertion that Spell knew of the remodel

11

obligation before the parties signed their October 21, 2016 purchase agreement. Gaudet claimed Ducharme had told her in September 2016 that he spoke with Spell about the requirement to remodel. Ducharme disputed Gaudet's testimony, however, and asserted that his first recollection of discussing the obligation with Spell was during their December 2016 meeting in Detroit. According to Ducharme, the meeting in Detroit was when he usually explained to potential franchisees about the meaning and concept of a remodeled "I7" store. Ducharme testified that when he addressed the requirement and associated cost of the upcoming remodel, Spell had expressed surprise. Ducharme's statements corroborated Spell's own testimony that the meeting at Little Caesar headquarters marked the first time he had ever heard about the remodel obligation.

¶20. In a further attempt to prove that a genuine factual dispute exists as to when Spell received notice of the remodel requirement, Walters points to the September 8, 2016 email Ducharme sent to Gaudet and Spell. After outlining the remaining steps and documents needed to obtain Little Caesar's approval of the transfer, Ducharme concluded with the following sentences: "One additional point to be aware of is the requirement [that] all stores that are not 'I7' must be remolded [sic] by Dec. 31, 2017." As the chancellor noted in her judgment, however, Ducharme's email provided no indication as to whether Walters's franchise was considered an "I7" store, whether a remodel to that location was necessary, the cost of any needed remodel, or which party should bear the obligation of any required remodel. In fact, the email failed to provide any context or explanation at all regarding the

12

meaning of an "I7" store. Despite Walters's assertions to the contrary, we fail to discern how such a vague reference about an "I7" store included at the end of one email creates a genuine dispute of fact as to whether Spell knew about the remodel requirement prior to signing the purchase agreement.

¶21. Upon review, we can find no competent record evidence to indicate that Spell knew about the remodel requirement prior to signing the purchase agreement—much less to create a genuine dispute of fact regarding the issue. We therefore conclude that this assignment of error lacks merit.

## II. Breach of Contract

¶22. Walters also contends the chancellor misinterpreted the terms of the parties' contract and therefore erroneously granted summary judgment to Spell on the breach-of-contract claim. Specifically, Walters challenges the chancellor's findings that under the plain language of the parties' contract, no effective transfer date ever occurred and that Walters therefore continued to bear the obligation to remodel the franchise.

¶23. "A breach-of-contract case has two elements: (1) the existence of a valid and binding contract, and (2) a showing that the defendant party has broken[] or breached it." *Bissette v. Univ. of Miss. Med. Ctr.*, 282 So. 3d 507, 515 (¶17) (Miss. Ct. App. 2019) (quoting *Maness v. K & A Enters. of Miss. LLC*, 250 So. 3d 402, 414 (¶43) (Miss. 2018)). "When interpreting a contract, the court must first determine if the contract is ambiguous." *Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing L.L.C.*, 290 So. 3d 1257, 1259 (¶5) (Miss. 2020).

13

"In making that determination, the Court must review the express wording of the contract as a whole." *Sledge v. Grenfell Sledge & Stevens PLLC*, 263 So. 3d 655, 664 (¶24) (Miss. 2018) (quoting *Epperson v. SOUTHBank*, 93 So. 3d 10, 16 (¶17) (Miss. 2012)). "If the contract is unambiguous, the intention of the contracting parties should be gleaned solely from the wording of the contract[,] and parol[] evidence should not be considered." *Sledge*, 263 So. 3d at 664 (¶24) (quoting *Epperson*, 93 So. 3d at 16 (¶17)). "[W]here no ambiguity exists, we "must 'accept the plain meaning of a contract as the intent of the parties . . . .'" *Liberty Mut. Fire Ins.*, 290 So. 3d at 1259 (¶5) (quoting *Epperson*, 93 So. 3d at 16 (¶17)).

¶24.    Appellate courts apply a three-part test to interpret a contract. *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 752 (¶10) (Miss. 2003). First, we look to the "four corners" of the contract for "the language that the parties used in expressing their agreement." *Id.* "[W]e . . . read the contract as a whole, so as to give effect to all of its clauses." *Id.* We focus less on "what the parties may have intended" and more so on "what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Id.* Second, "if the parties' intent remains uncertain, the court may discretionarily employ canons of contract construction." *Cypress Springs LLC*, 161 So. 3d at 1104 (¶10) (quoting *Chapel Hill LLC v. SoilTech Consultants Inc.*, 112 So. 3d 1097, 1099 (¶10) (Miss. Ct. App. 2013)). Third, "if the contract continues to evade clarity as to the parties' intent," only then do we "consider extrinsic or parol evidence" such as the parties' "prior negotiation, agreements[,] and conversations" to

14

determine their intent. *Royer Homes*, 857 So. 2d at 753 (¶11).

¶25. In the context of summary judgment, the Mississippi Supreme Court has stated:

> [T]he reviewing Court need not go through the entire three-step analysis; the Court should determine only whether the contract is ambiguous. Questions of contract construction and ambiguity are questions of law that are committed to the court rather than questions of fact committed to the fact finder. If the reviewing Court finds the terms of the contract to be ambiguous or subject to more than one interpretation, the case must be submitted to the trier of fact, and summary judgment is not appropriate.

*Epperson*, 93 So. 3d at 17 (¶20) (citations and internal quotation mark omitted).

¶26. In the dispute before us, the parties submit that their contract, which consists of both the purchase agreement and the incorporated franchise agreement, is unambiguous. They disagree, however, as to which party bore the responsibility outlined in section 5.6 of the franchise agreement to remodel the restaurant by December 31, 2017. "[T]he mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law." *Royer Homes*, 857 So. 2d at 753 (¶10). Our caselaw defines "[a]n ambiguity . . . as a susceptibility to two reasonable interpretations." *Carmody v. McGowan*, 222 So. 3d 1064, 1066 (¶6) (Miss. Ct. App. 2017) (quoting *Dalton v. Cellular S. Inc.*, 20 So. 3d 1227, 1232 (¶10) (Miss. 2009)). "Thus, this Court must determine if one could objectively view the contract and find more than one reasonable interpretation." *Cypress Springs LLC*, 161 So. 3d at 1104 (¶13).

¶27. As the chancellor found, the parties' purchase agreement provided that steps beyond just the execution of the contract had to be completed before an effective franchise transfer

15

could occur. The last sentence of the purchase agreement stated that the agreement was "effective as to transfer when executed by both parties *and thereafter approved by Franchisor* [*(Little Caesar)*] *and funded by Transferee.*" (Emphasis added). Thus, although the parties signed the contract on October 21, 2016, additional requirements clearly had to be satisfied before Walters could complete the transfer to Spell.

¶28. Between the time the parties signed their purchase agreement and when their contract terminated, the franchise continued to operate. The plain language of the parties' contract provided that during that period Walters, as the franchisee, continued to bear all obligations assigned to it under the franchise agreement. The chancellor therefore properly concluded that the plain language of the contract held Walters liable for all franchise obligations until an effective date of transfer and that because no such transfer had yet occurred, Walters remained liable for all franchise obligations, including the remodel requirement, at the time the agreement terminated.

¶29. In addition to the chancellor's findings, we note that although the parties' purchase agreement provided that Spell would "exclusively" bear "all future obligations," section 12.2.7 of the franchise agreement stated that "[t]he transferor [(Walters)] shall remain liable for all of the obligations to Little Caesar in connection with the Restaurant that *arose prior to the effective date of the transfer . . . .*" (Emphasis added). As discussed, Ducharme's undisputed testimony reflected that by the end of 2015, Little Caesar had decided to require a remodel of all its locations and had subsequently notified all franchisees of its decision well

16

before the parties signed their purchase agreement on October 21, 2016. Thus, based on the plain language of section 12.2.7, the remodel obligation clearly "arose prior to the effective date of the transfer[,]" and as such, the requirement's completion fell squarely on Walters's shoulders.

¶30. In looking to the four corners of the parties' contract and the language they employed, we find no ambiguity as to which party bore the responsibility for the remodel obligation. As the chancellor properly concluded, Walters remained liable for the remodel requirement, even after the parties signed their agreement. We therefore find no error in the chancellor's grant of summary judgment to Spell on the breach-of-contract claim.

### III.   Implied Covenant of Good Faith and Fair Dealing

¶31. As Walters correctly points out, the parties' contract contained an implied covenant of good faith and fair dealing that Spell could have breached even if he complied with all the express terms of the contract. *See Jones v. Miss. Insts. of Higher Learning*, 264 So. 3d 9, 20 (¶¶30-31) (Miss. Ct. App. 2018). Our caselaw recognizes that "[a]ll contracts contain 'an implied covenant of good faith and fair dealing in performance and enforcement.'" *Caplinger v. Whitney Bank*, 293 So. 3d 307, 312 (¶18) (Miss. Ct. App. 2020) (citations omitted). In describing this duty, we have stated:

> [It] is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of

17

> the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.
>
> Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness[,] or reasonableness. Stated differently, the covenant holds that neither party will do anything which injures the right of the other to receive the benefits of the agreement.

*Id.* at 18-19 (¶27) (citations and internal quotation marks omitted).

¶32. The chancellor correctly found that under the plain language of the parties' contract, Walters maintained liability for the remodel obligation even after the parties signed their purchase agreement. Thus, Spell did not breach any express contract terms by refusing to assume the remodel obligation once he learned of it during his December 2016 meeting with Ducharme in Detroit. Moreover, the record reflects that Spell not only failed to violate any express terms of the contract but that with regard to the remodel obligation specifically, he acted in good faith to go beyond his contractual obligations and to attempt to reach a resolution after learning of the requirement.

¶33. As previously discussed, we find that no genuine factual dispute exists regarding when Spell first learned of the remodel obligation. Spell texted Gaudet after his December 2016 meeting with Ducharme and inquired about splitting the cost of the remodel with Walters. During her deposition, Gaudet acknowledged that she had received Spell's inquiry about splitting the cost of the remodel. She testified, however, that she never responded to Spell's text because she had believed the remodel fell outside her contractual obligations.

18

¶34. Upon review, we find no genuine issue of material fact exists as to whether Spell breached the implied covenant of good faith and fair dealing. The parties' contract clearly provided that Spell had no duty to assume the remodel obligation. Indeed, under the plain language of the contract, he was justified in his expectation that the duty to remodel remained solely Walters's responsibility. The record reflects, however, that Spell was willing to voluntarily share in the financial burden of the remodel cost with Walters and that he communicated this to Gaudet. As Gaudet testified, though, she refused to respond, and all dealings between the parties subsequently ended. Based on such facts, we find no error in the chancellor's grant of summary judgment to Spell on this issue. We therefore find Walters's assignment of error lacks merit.

## CONCLUSION

¶35. Upon review, we find that no genuine issues of material fact exist that would preclude the chancellor's grant of summary judgment to Spell. We therefore affirm the chancellor's judgment.

¶36. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**

19